371 So.2d 521 (1979)
Gladys M. FULKA, Appellant,
v.
Florida COMMERCIAL BANKS, INC., d/b/a Commercial Bank & Trust Company, Etc., Appellee.
No. 78-1569.
District Court of Appeal of Florida, Third District.
May 22, 1979.
*522 Steven Gary, North Miami Beach, for appellant.
Levine, Reckson & Reed and Robert S. Geiger, Miami, for appellee.
Before HAVERFIELD, C.J., and PEARSON and SCHWARTZ, JJ.
SCHWARTZ, Judge.
The appellant, Mrs. Fulka, was the plaintiff below in an action against the defendant-appellee bank for the conversion of two checks of which she was the named payee. Her case was based upon the bank's payment of the checks upon allegedly forged indorsements. In granting the defendant's motion for involuntary dismissal under Fla. R.Civ.P. 1.420(b) at the conclusion of the plaintiff's case in a non-jury trial, the trial judge ruled that Mrs. Fulka could not recover because, as a matter of law, she had, by her conduct, ratified the supposed forgeries. We agree and affirm the judgment below.
Some months prior to September, 1973, Mrs. Fulka became acquainted, through her employment as a bookkeeper for a carpet concern, with a man named Cy Okum. She entered into negotiations with Okum under which she would invest funds either by going into partnership with him or by purchasing an interest in his own supposedly existing carpet company. Early in September, 1973, Mrs. Fulka went on a trip to California. Before she left, she made a $6,400 loan against her account with her broker, Bache & Co. Mrs. Fulka intended to use the funds to invest with Okum.[1] Since she was to be gone on vacation she therefore instructed Bache to send the checks, which represented the loan proceeds and which were payable to her order, directly to him at his business address. She told Okum, however, that he was authorized *523 only to deposit the checks in her account at the Hollywood Southeast Bank. Okum received the checks  one for $4,000 and one for $2,400  on September 6, 1973 while Mrs. Fulka was still away. Contrary to her instructions, he indorsed them by signing her name, and negotiated them with the Commercial Bank & Trust Co., the present appellee. The proceeds were deposited in Okum's account at that bank.
The defendant bank concedes that it would be at least prima facie liable for conversion by paying the checks on a forged indorsement[2]  if that were the end of the story. But it is not. For a few days later when Mrs. Fulka returned from California, Okum specifically told her what he had done with the checks and where the money was. Her own testimony at the trial clearly demonstrates that she had no objection whatever to Okum's actions and that it was perfectly all right with her for him to keep the funds during the course of their negotiations. In other words, Mrs. Fulka was looking only to Okum, the intended recipient of the money, for its eventual return  hopefully with a profit as well. It was only several months later, when Okum perhaps predictably disappeared with the funds, that she claimed that someone else was responsible for the loss and began to pursue the bank which had supposedly converted "her" checks.[3] The trial judge was entirely *524 correct in concluding that this description of her own actions demonstrated conclusively that Mrs. Fulka had ratified the bank's improper payments.
The controlling provision of the U.C.C. is Section 673.3-404, Florida Statutes (1977), which states:
"(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value.
(2) Any unauthorized signature may be ratified for all purposes of this chapter. Such ratification does not of itself affect any rights of the person ratifying against the actual signer." [e.s.]
Within the meaning of this provision, as stated in Restatement of Agency 2d, § 82 (1958):
"Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him."
The "affirmance" thus required to create a ratification may arise from conduct which can be rationally explained only if there were an election to treat a supposedly unauthorized act as in fact authorized. Restatement of Agency, 2d § 83 (1958); see Thermo Contracting Corp. v. Bank of New Jersey, 69 N.J. 352, 354 A.2d 291, 296 (1976); Atlas Building Supply Co., Inc. v. First Independent Bank of Vancouver, 15 Wash. App. 367, 550 P.2d 26, 28 (1976); Common Wealth Ins. Systems, Inc. v. Kersten, 40 Cal. App.3d 1014, 115 Cal. Rptr. 653 (1974); cf. G & M Restaurants Corp. v. Tropical Music Service, Inc., 161 So.2d 556 (Fla. 2d DCA 1964). That principle is directly applicable here. Mrs. Fulka's actions can be fairly viewed only as evincing her intention to approve and agree to the results of the bank's action in letting Okum have the money.[4]
It is established in Florida that one may be barred by ratification from asserting a claim based upon the forgery of a negotiable instrument. Chemical Corn Exchange Bank & Trust Co. v. Frankel, 111 So.2d 99, 102 (Fla. 3d DCA 1959). Our conclusion that it occurred in this case is, as the bank contends, strongly supported by the decision of the New Jersey Supreme Court in Thermo Contracting Corp. v. Bank of New Jersey, supra. In that case, checks had been issued jointly to a general contractor, Thermo, and a sub-contractor, Kashulines. The checks were received by Kashulines who forged the general's indorsement and deposited the proceeds in his own account. Like Mrs. Fulka in this case, Thermo learned of the forgeries shortly after they occurred, but, again like the plaintiff, took no action against anyone[5] for several months. It did so in order to secure the cooperation of the sub on several projects upon which they were both working.[6] Only after the sub went out of business *525 did Thermo bring an action against the bank which had paid on the forgeries. On these facts, which are indistinguishable from those before us, the court affirmed a summary judgment for the bank. It held, in a scholarly and soundly reasoned decision upon which we could not improve, that ratification had been established as a matter of law. For the same reasons, we reach the same conclusion. See also Rakestraw v. Rodrigues, 8 Cal.3d 67, 104 Cal. Rptr. 57, 500 P.2d 1401 (1972); American Cast Iron Pipe Co. v. American R. Co., 87 F.2d 250 (1st Cir.1936).[7]
Affirmed.
NOTES
[1] On this point, the record shows the following:

"Q In fact, the purpose of that money was to purchase a partnership interest or a stock interest in Mr. Okum's business; was it not?
"A Yes, sir.
"Q How much more money were you intending to give Mr. Okum, above the $6400?
"A About $18,000."
[2] Section 673.3-419(1)(c), Florida Statutes (1977); Barnett Bank of Miami Beach, N.A. v. Lipp, 364 So.2d 28 (Fla. 3d DCA 1978); cf. City National Bank of Miami, N.A. v. Wernick, 368 So.2d 934 (Fla. 3d DCA 1979).
[3] Mrs. Fulka testified:

"Q When you came back, did you contact Mr. Okum?
"A Yes, sir."
* * * * * *
"Q Did you talk about the checks?
"A Yes, sir.
"Q What did you say to him?
"A I asked him what happened to the funds, and he said that he had put them into his bank account.
"Q When was this conversation? When did this conversation take place?
"A I would assume a few days after I returned."
* * * * * *
"Q Well, let's talk about in September of 1973, as soon as you found out what happened.
"A Uh-huh.
"Q What did you do? Who did you notify?
"A I didn't notify anyone"
* * * * * *
"Q I am talking about notifying anyone that Mr. Okum apparently had not followed the instructions that you say you gave him in connection with those checks.
"A Probably.
"Q It was over a year?
"A Probably.
"Q Why did you wait so long?
"A I was trying to get in touch with Mr. Okum, because he had told me that he would pay me back."
* * * * * *
"Q Then is it fair to say that your answer is that you were not concerned as to where your money was or what was going to happen to it and and that you were not concerned about losing your money, even after you knew that Mr. Okum had cashed your checks?
Is that right?
"A At that time I was of the assumption that he would  either the deal would be consummated or he would refund the money to me.
"Q The business deal, you believed at that time that the business deal would be consummated?
"A It was in negotiation."
* * * * * *
"Q You said that the first person that you told about the fact that Mr. Okum had cashed your checks was your attorney, Mr. Gary.
What caused you at that specific time to go to Mr. Gary and tell him what happened?
"A Because I was not able to contact Mr. Okum.
"Q So as long as you were able to maintain contact with Mr. Okum, you were not concerned; were you?
"A Well, I felt like he would be making restitution to me for the checks.
"Q The fact of the matter was that you intended to look to Mr. Okum to recover your money; is that correct?
"A Yes, sir."
* * * * * *
"Q So that you were not particularly concerned with the fact that Commercial Bank & Trust had cashed that check; were you?
"A Not the few days right after I got back, no.
"Q It was not until several months later, when you could not recover your money from Mr. Okum, that you became concerned about that?
"A I became concerned after we  the negotiations were falling through on the partnership.
"Q But so long as you had your partnership negotiations, you were not concerned at all about where that money was; isn't that right?
"A Not overly concerned.
"Q Okay.
"A I knew where it was."
[4] It makes no difference that the bank did not even know of, much less rely on, Mrs. Fulka's ratification and thus, as it was put at the oral argument, that it simply "lucked out" of liability in this case. The affirmance of a previously unauthorized transaction is effective even if it is not communicated. Restatement, Agency 2d § 95. In this respect, the ratification doctrine may differ from the showing necessary to establish an estoppel. See discussion in the Thermo case, supra, at 354 A.2d 295, n. 3.
[5] Compare Atlas Building Supply Co., Inc. v. First Independent Bank of Vancouver, supra, a case very similar in its facts to Thermo, but in which the plaintiff's active efforts to secure payment for the sums represented by the checks were held to have negated a finding of ratification as a matter of law.
[6] The description of the transaction by Thermo's principal is uncannily similar to Mrs. Fulka's testimony here. Note 2, supra. It is set forth as follows at 354 A.2d 294:

"Q. So that in November 1971 you learned presumably for the first time, that * * * the four checks which are the subject matter of our presence here today, payable to Thermo, drawn by Seabrook, were paid or issued?
A. Yes, were issued.
Q. I see. You learned that for the first time in November 1971?
A. Uh Huh.
Q. I see. What did you do?
A. I immediately took it up with Kashulines.
Q. And.
A. And we talked.
* * * * * *
Q. And what was the extent of your discussion with Kashulines concerning the matter?
A. He told me that he was pressed for cash, he had to use the money. He apologized and told me he would make it up to me as soon as he possibly could.
Q. Was that acceptable to you?
A. At the time it was.
* * * * * *
Q. * * * you accepted his explanation as to his being sorry and he'll make it up to you.
A. Yes, I did. * * * I had faith in the man."
[7] An alternative, but closely related line of analysis of the situation which also requires affirmance is that the plaintiff suffered no damages as a result of the alleged conversion. This is so because, even if Mrs. Fulka had herself been paid the proceeds of the checks, she meant them eventually to be transmitted to Okum anyway. See Note 1, supra. Analogously, it is well-established that a drawer is precluded from recovering on an improperly paid check when the proceeds actually reach the person intended to receive them. Blomquist v. Zions First National Bank, N.A., 18 Utah 2d 65, 415 P.2d 213 (1966); Sundail Construction Co. v. Liberty Bank of Buffalo, 277 N.Y. 137, 142, 13 N.E.2d 745, 747 (1938).