241 N.J. Super. 55 (1990)
574 A.2d 468
LIDA M. STELLA, PLAINTIFF,
v.
DEAN WITTER REYNOLDS, INC., DEFENDANT-RESPONDENT-CROSS-APPELLANT, AND DEAN WITTER REYNOLDS HIGH YIELD SECURITIES, INC., AND CLIFFORD R. MURRAY, DEFENDANTS, AND MORGAN GUARANTY TRUST COMPANY OF NEW YORK, DEFENDANT-RESPONDENT.
MIDLANTIC NATIONAL BANK/SOUTH, DEFENDANT-RESPONDENT-THIRD-PARTY PLAINTIFF-APPELLANT,
v.
JOHN J. SYKES, JR., THIRD-PARTY DEFENDANT-RESPONDENT-CROSS-APPELLANT, AND THOMAS J. MCDONOUGH, JR., THOMAS J. MCADAM, JR., SCOTT A. CONESKY, THERESA CONESKY, EDWARD H. KAY, REGINA A. KAY, MARGARET WHITE, ELMER J. PARSONS, NANCY L. PARSONS, ELEANOR DOWNER, S. WHITNEY DOWNER, LUCILLE M. ROBERTSON, GWENN GRAVES HAMILTON, ROBERT H. BROWN, BEVERLY A. BROWN AND MARY L. BROWN, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 19, 1989.
Decided April 24, 1990.
*59 Before Judges DEIGHAN, COHEN and BROCHIN.
Charles H. Hoens, Jr. argued the cause for appellant-cross-respondent Midlantic National Bank/South (Lum, Hoens, Abeles, Conant & Danzis, attorneys; William D. Wallach, on the brief).
William C. Todd, III argued the cause for respondent-cross-appellant John Sykes, Jr. (William C. Todd, III, attorney; William C. Todd, on the brief).
Jeffrey Speiser argued the cause for respondent-cross-appellant Dean Witter Reynolds, Inc. (Hellring, Lindeman, Goldstein, Siegel, Stern & Greenberg, attorneys; Richard K. Coplon and Jeffrey Speiser, of counsel and on the brief).
William John Kearns, Jr. argued the cause for respondent Morgan Guaranty Trust Company of New York (Kearns & Kearns, attorneys; William John Kearns, Jr., on the brief).
The opinion of the court was delivered by BROCHIN, J.A.D.
In 1970, Clifford Murray, a stockbroker who was employed as an account executive by Dean Witter Reynolds, Inc., successfully solicited John Sykes, a friend or longtime acquaintance, to open an investment account at Dean Witter's Atlantic City office and to purchase investment securities through Murray. Eventually Sykes' account became an "Active Assets" account with check-writing privileges and Sykes used it as his sole *60 checking account as well as for his brokerage transactions. By 1980 Sykes had invested approximately $250,000 in treasury bills with Dean Witter and in 1981, at Murray's suggestion, began investing some of his money in money market funds.
Beginning in September 1981, Murray offered Sykes opportunities to invest in what Murray described as the Dean Witter Reynolds Special Situations Fund in New York. Murray told Sykes that the fund consisted of new issues of common stock offered at a discount to Dean Witter as the underwriter. Participation in the fund, Murray explained, was available only to Sykes and other similarly preferred customers. Sykes testified that between September 1981 and October 1982, he entrusted $328,000 to Murray for investment in the Special Situations Fund.
Subsequent events revealed that Murray's New York Special Situations Fund did not exist. It was entirely a fragment of Murray's imagination through which he fraudulently obtained a large sum of money from Sykes and a number of other Dean Witter customers. Murray eventually pleaded guilty to both state and federal charges of defrauding and misappropriating investors' funds and he is now in prison. See McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 754 n. 1 (3d Cir.1990). Sykes claims that out of his total investment of $328,000, Murray returned only $45,000, and that he has therefore lost $283,000.
Sykes made his first investment in Murray's New York Special Situations Fund in September 1981 by transferring funds to Murray out of his regular brokerage account. At Murray's direction, Dean Witter drew its $20,000 check payable to Sykes, drawn on the firm's regular checking account at Morgan Guaranty Trust Company. The $20,000 was charged to Sykes' brokerage account. Sykes endorsed the check in blank and delivered it to Murray. The evidence at trial showed that Murray, unaccompanied by Sykes, cashed the check at the Ventnor Heights branch of Midlantic National Bank/South. *61 We do not know how Murray disposed of the funds. Sykes' September 1981 statement for his Dean Witter account showed the date and amount of the check and the explanation, "check" and "funds paid." Murray persuaded Sykes that this entry reflected Dean Witter's handling of an internal transfer of funds out of Sykes' brokerage account for investment in the New York Special Situations Fund. Sykes never received any other documentation for this investment.
In December 1981, Murray returned $20,000 to Sykes' Dean Witter account with the explanation that that was the principal amount of Sykes' investment in the New York Special Situations Fund and that the profit on the transaction would remain invested.
In January 1982, Murray told Sykes that Dean Witter was underwriting an increased number of new issues which would provide additional opportunities for investment in the Special Situations Fund. Three more Dean Witter checks were drawn on the firm's checking account at Morgan Guaranty Trust Company, payable to Sykes and charged to his brokerage account; a $30,000 check dated January 5, 1982, a $5,000 check dated January 7, 1982, and a $36,000 check dated January 28, 1982. Sykes endorsed each of these checks in blank and delivered it to Murray. He testified that he did not realize that what he was signing were checks, but he conceded that he intended to authorize the transfer of the money from his brokerage account to Murray for investment in the Special Situations Fund.
On January 13, 1982, Sykes endorsed in blank two payroll checks, totalling $78,420.16, and delivered them to Murray. Sykes testified that he instructed Murray to deposit them in his Dean Witter account. However, Murray cashed the payroll checks at Midlantic's Ventnor Heights branch and received a $38,420.16 cashier's check and $40,000 cash in exchange. He deposited the $38,420.16 in Sykes' Dean Witter account and told Sykes that he had invested the remaining $40,000 in the New *62 York Special Situations Fund. Sykes protested that he had bills to pay and that Murray should not have disobeyed his instructions to deposit the entire $78,420.16 in his brokerage account. But when Murray promised not to disregard Sykes' instructions again, Sykes acquiesced in Murray's investment of the $40,000 in the Special Situations Fund.
In June 1982, Murray returned an additional $25,000 to Sykes' Dean Witter account, ostensibly as a further return of capital. In July, August and October 1982, according to Sykes, he delivered a total of $30,000 in cash to Murray at Dean Witter's Atlantic City office.
Murray arranged to have four other Dean Witter checks issued to Sykes; for $30,000 dated July 20, 1982, for $120,000 dated August 18, 1982, for $8000 dated August 26, 1982, and for $9,000 dated August 26, 1982. The checks were payable to Sykes and were charged to his Dean Witter account, but Murray forged Sykes' endorsements, presented the checks at Midlantic's Ventnor Heights branch, and received cashiers' checks and currency in exchange. Sykes testified that although he did not authorize Murray to sign his name, he did authorize the transfers out of his Dean Witter brokerage account for investment in the Special Situations Fund. Entries on his monthly statements showed that the checks were charged to his account, and he interpreted the entries as confirming the transfers.
During the same period, Murray was using similar stratagems to obtain funds from other Dean Witter customers. He duped them into authorizing investments in Dean Witter's New York Special Situations Fund and cashed their checks at Midlantic's Ventnor Heights branch office. There was evidence that the total amount for which he purchased cashier's checks at that branch office amounted to more than $3,000,000. On one occasion, the branch cashed a check for him in the amount of $457,000, payable to a pension fund, and delivered that entire amount to Murray in $100 bills. He would call the bank in *63 advance so that the cash and cashiers' checks could be prepared for him before he arrived. Midlantic employees testified that cashing third-party checks, checks payable to corporations and checks payable to pension funds at Murray's request became a regular routine, although they knew that the practice was in direct violation of stated bank policy.
Although Sykes made his last payment to Murray for investment in the Special Situations Fund in October 1982, Sykes' confidence in Murray apparently remained unshaken until after February 1984. When Murray suggested in February 1984 that Sykes invest $100,000 of his company's pension fund in the New York Special Situations Fund, Sykes apparently viewed the suggestion favorably since he arranged to have his father, who was in charge of pension fund investments, meet with Murray to discuss the proposal. No investment resulted because Murray, unable to provide Sykes' father with specific facts about the investment, reported later that same day that the investment opportunity was not available because the underwriting was being postponed.
In March 1984, Sykes' brother-in-law, who was also one of Murray's customers, was unable to obtain a check which was due to him from Murray and which he needed to close his purchase of a house. As a result, Sykes began to worry about his New York Special Situations Fund investment and only then went to his attorney who asked Dean Witter for an accounting. At about the same time, the fraud was exposed.
When all the proofs had been presented, the court submitted the case to the jury on 32 special interrogatories. The jury found that Sykes had suffered damages in the amount of $167,000 as the result of Dean Witter's fraud, violation of the New Jersey Securities Act, breach of contract and negligence. That amount was equal solely to the sum of the checks on which Murray had forged Sykes' endorsements, and it represented $116,000 less than his total claim. The jury found that Sykes was "in pari delicto" with Dean Witter, that Dean *64 Witter was 70 percent negligent and Sykes 30 percent negligent, and that the negligence of both had proximately caused Sykes' loss. The jury also found that Midlantic National Bank/South paid $167,000 on checks with forged endorsements, that in doing so it did not act "in good faith and in accordance with the reasonable commercial standards of the banking business," that Sykes ratified all of the forgeries, and that Murray supplied "Dean Witter Reynolds with the name of the payee John Sykes intending that John Sykes had no interest in any checks." The jury determined that Sykes was entitled to $166,000 of punitive damages from Midlantic National Bank/South, but no punitive damages from Dean Witter Reynolds. None of the special interrogatories directed to the jury referred expressly to Morgan Guaranty Trust Company.
The court molded the verdict and entered a detailed form of judgment which awarded Sykes $166,000 punitive damages, without prejudgment interest, against Midlantic National Bank/South. The judgment provided that he could elect to recover from Dean Witter either $167,000 damages plus $49,064 prejudgment interest on his breach of contract claim, or 70 percent of his $167,000 damages, i.e. $116,900, plus $53,763.18 prejudgment interest, on his negligence claim. The judgment recited that Sykes was not entitled to recover against Midlantic National Bank/South and Dean Witter on any other cause of action and that he had no cause for action on any claim against Morgan Guaranty Trust Company.
Midlantic National Bank/South has appealed and Sykes and Dean Witter have cross-appealed. Midlantic challenges the award of punitive damages. It contends that punitive damages could not properly be awarded because Sykes recovered no compensatory damages against the bank and because it was not proved guilty of the kind of outrageous conduct which would warrant punitive damages. Alternatively, the bank contends, the award of punitive damages was the product of mistake, bias, passion and prejudice and, if the judgment for punitive damages could otherwise be sustained, the bank would be *65 entitled to a new trial on that issue. In addition, Midlantic claims that the court should have granted its pretrial motion for summary judgment based on N.J.S.A. 12A:3-405(1)(c), the New Jersey "fictitious payee" provision of the Uniform Commercial Code which is designed to assure that the risk of loss caused by a faithless employee is borne by his employer.
Dean Witter contends that because of the jury's finding that Sykes was in pari delicto, he was entitled to recover only on his negligence claim and not for breach of contract. Alternatively, it argues, even if he was entitled to recover on the contract claim, the award of prejudgment interest was an abuse of discretion because it was inconsistent with the equities as determined by the jury's verdict.
Sykes claims that he was entitled to $167,000 compensatory damages from Midlantic National Bank/South and that the trial court should have granted his motions for judgment and for judgment notwithstanding the verdict, awarding him $283,000 compensatory damages against Dean Witter. He also argues that the court erred in computing the amount of prejudgment interest which it awarded, in denying him compensatory damages against Morgan Guaranty Trust Company, and in holding that he was not entitled to recover triple damages from Dean Witter for violation of New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-1 and following. Sykes also asserts that if judgment is not entered in his favor against Dean Witter for $283,000, or if the jury's verdict of $166,000 punitive damages against Midlantic National Bank/South is set aside, he should be entitled to a new trial.

I

Sykes Claims Against the Banks

(a) Compensatory Damages
On undisputed facts, the jury found that Midlantic, as the depositary bank, paid Murray $167,000 for four Dean Witter checks that were payable to Sykes and that bore endorsements *66 forged by Murray. However, it also found facts which supported various affirmative defenses. On the basis of those findings, the trial court ruled that recovery of compensatory damages from the bank was barred by N.J.S.A. 12A:3-405(1)(c) (the fictitious payee defense), N.J.S.A. 12A:3-404 (ratification) and N.J.S.A. 12A:3-406 (negligently contributing to an unauthorized signature).
In our view, N.J.S.A. 12A:3-404 (ratification) is dispositive of Sykes' claims for compensatory damages from Midlantic National Bank/South, and we will therefore consider only that defense. Insofar as pertinent, the section reads as follows:
(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it....
(2) Any unauthorized signature may be ratified for all purposes of this Chapter. Such ratification does not of itself affect any rights of the person ratifying against the actual signer.
The Uniform Commercial Code comment to this section states:
(ii) ... A forged signature may at least be adopted; and the word "ratified" is used in order to make it clear that the adoption is retroactive and that it may be found from conduct as well as from express statements. Thus, it may be found from the retention of benefits received in the transaction with knowledge of the unauthorized signature; and although the forger is not an agent, the ratification is governed by the same rules and principles as if he were.
See Thermo Contracting Corp. v. Bank of N.J., 69 N.J. 352, 354 A.2d 291 (1976).
Sykes argues that the facts of the present case do not show ratification because he was unaware that the New York Special Situations Fund was a fraud and he did not know that Murray had transferred his funds to that investment by forged endorsements. Without that information, Sykes contends, he did not have the "full knowledge of all the material facts," Thermo Contracting Corp. v. Bank of N.J., supra, at 361, 354 A.2d 291, which was a prerequisite to ratification.
We disagree. To ratify, Sykes had to know only material facts. In the context of this case, that Murray forged Sykes' signature to effect the transfer of $167,000 from Sykes' brokerage account and that Murray misappropriated the money was *67 not material to the issue of ratification of the unauthorized endorsements. Sykes admitted that he intended to entrust the money to Murray for investment according to Murray's recommendation. He conceded that he knew from past experience that the notations which appeared on his July and August 1982 brokerage account statements indicated that $167,000 had been charged to his account and had been transferred to Murray for the Special Situations Fund. The brokerage account statements referred to checks. If he did not know from these facts that Murray had endorsed checks in his name, the only reason for his not knowing was that the method by which Murray effected the transfers was immaterial since the transfers themselves were known, authorized and approved by Sykes. Significantly, although Sykes knew about these transfers before or shortly after they were made, he did not complain about them until more than a year and a half later. On these facts, the jury was certainly entitled to find, as it did, that Sykes ratified the forged endorsements totaling $167,000.
Fulka v. Florida Commercial Banks, Inc., 371 So.2d 521 (Fla. Dist. Ct. App. 1979), is an analogous case. In Fulka, the plaintiff intended to make a loan to her prospective partner. She drew two checks payable to herself and, because she was about to leave on a short vacation, turned them over to her prospective partner for deposit in the drawer's own account. She planned that when she returned from vacation, the funds would be available and she would be able to use them to make the intended loan. The prospective partner however, forged the plaintiff's endorsement and deposited the checks to his own account. When plaintiff returned from vacation and learned of the forgery, she expressed no objection to the shortcut. When the prospective partner disappeared several months later, however, plaintiff sued the depositary bank. Like the trial court in the present case, the court in Fulka held that plaintiff had ratified the forged endorsement.
*68 Although the jury found that Midlantic did not act in good faith and in accordance with commercially reasonable standards in cashing the checks with forged endorsements, ratification absolved the bank from liability, just as Sykes' authorization of the endorsements in advance would have done. Eutsler v. First Nat'l Bank, Pawkuska, 639 P.2d 1245, 1246-1247 (Okla. 1982); American Travel v. Central Carolina Bank, 57 N.C.App. 437, 291 S.E.2d 892, 895-896, rev. den. 306 N.C. 555, 294 S.E.2d 369 (1982). Cf. 1 Restatement, Agency 2d, § 92(f) at 237 (1958).
The undisputed facts which support the defense of ratification can also be viewed as defeating Sykes' compensatory damage claim against Midlantic for a different, but related, reason. As the former Court of Errors and Appeals observed in Board of Educ., Tp. of Jefferson v. National Union Bank of Dover, 121 N.J.L. 177, 179-180, 1 A.2d 383 (E. & A. 1938), quoting 9 C.J.S. Banks and Banking, § 9356c at 734 (1938), "[g]enerally a bank is liable ... on a forged endorsement, in the absence of estoppel, contributory negligence, or ratification, or unless the money has reached the intended person." (Emphasis added.) If the funds obtained by the forgery reach the intended payee, the maker has suffered no injury and is not entitled to recover from the bank which paid on the forged endorsement. See Fulka, supra, 371 So.2d at 525 n. 7; Clemens v. First Nat'l Bank of Berryville, 286 Ark. 290, 692 S.W.2d 222, 225 (1985); Jones v. American Bank and Trust Company, 387 So.2d 1360 (La. Ct. App. 1980); Blomquist v. Zions First Nat'l Bank, N.A., 18 Utah 2d 65, 415 P.2d 213 (1966); Sundail Const. Co. v. Liberty Bank of Buffalo, 277 N.Y. 137, 142, 13 N.E.2d 745, 747 (1938). In the present case, the funds paid on the forged endorsements were transmitted to Murray, where Sykes wanted them to go. He suffered no injury as the result of the Bank's action in paying on the forged endorsements. His injury was the result of his entrusting the funds to Murray and not the result of the manner in which they were transmitted. Consequently, the trial court was correct in *69 holding that Sykes failed to prove that he was entitled to compensatory damages from Midlantic National Bank/South.
Sykes' claims for compensatory damages from Morgan Guaranty Trust Company, the drawee bank which paid on the forged endorsements, must fail for the same reasons.

(b) Punitive Damages
Midlantic contends that because Sykes did not recover any compensatory damages, we should reverse the jury's award of $166,000 in punitive damages. Sykes, however, argues that even if the trial court was correct in declining to award him compensatory damages against the Bank, the award of punitive damages should nonetheless be sustained under the rule of Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 477 A.2d 1224 (1984).
In Nappe, supra, the Supreme Court declared that "punitive damages may be assessed in an action for an intentional tort involving egregious conduct whether or not compensatory damages are awarded, at least where some injury, loss or detriment to the plaintiff has occurred." Id. at 51, 477 A.2d 1224 (emphasis added). The phrase, "at least," might be interpreted as leaving open the possibility that punitive damages may be available even if a claimant has not suffered "injury, loss, or detriment." However, the Court in Nappe expressly held that the trial judge was correct in instructing the jury that to justify an award of punitive damages, "a jury would need to find that the plaintiff suffered some harm as a result" of the defendant's intentional tort. Id. at 54, 477 A.2d 1224. Cf. O'Connor v. Harms, et al., 111 N.J. Super. 22, 29-30, 266 A.2d 605 (App. Div.), certif. den. 57 N.J. 137, 270 A.2d 40 (1970) (Punitive damages may not be awarded where there has not been an award even of nominal damages). In a concurring opinion in Nappe, arguing that the showing required for punitive damages should be less burdensome than that established by the majority, Justice O'Hern wrote, "to support an award of punitive damages, I would require, at a minimum, that the jury find *70 ... the plaintiff did not get what he or she bargained for." Nappe, supra, 97 N.J. at 60, 477 A.2d 1224. Our reading of Nappe requires us to hold that, although an award of compensatory damages is not a prerequisite to an award of punitive damages, Sykes cannot recover punitive damages against Midlantic National Bank/South unless he suffered "some harm" as the result of its conduct.
Although the jury found that Sykes was damaged by Midlantic's cashing the checks on which Murray had forged his endorsements, we have affirmed the trial court's holding to the contrary. The jury found expressly that Dean Witter and Midlantic did not engage in a conspiracy to defraud Sykes. It was not asked whether Sykes was harmed by any aspect of the Bank's conduct apart from cashing $167,000 of checks with forged endorsements. Consequently, the record is clear that the jury made no sustainable finding that Sykes suffered harm at Midlantic's hands. There is ample evidence in the record which would have supported a finding that the Bank's wholesale disregard for reasonable banking standards and for the policies and practices established by the Bank itself harmed Sykes by enabling Murray to divert customers' funds to his own use and thus to carry on his scheme, but the jury was never asked the necessary question.[1]
*71 R. 4:39-1 deals with the consequences of an omission to ask a question which is essential to a judgment entered in accordance with answers to special interrogatories. Insofar as pertinent, the rule states:
The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact, in which case it may submit to the jury either written questions which can be categorically or briefly answered or written forms of the several special findings which might properly be made under the pleadings and evidence.... If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issues so omitted unless before the jury retires he demands its submission to the jury. The court may make a finding as to an issue omitted without such demand, or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict [Emphasis added].
Here the trial judge entered a judgment awarding punitive damages to Sykes in accordance with the jury's verdict. But in explaining his denial of Midlantic's post-trial motion for a judgment of no cause for action notwithstanding the punitive damage verdict, he expressly disclaimed any intention of finding that Sykes had been harmed by the Bank's conduct, although he implied that the evidence would support such a finding. The trial judge's rationale for his ruling, with which we disagree, was that Sykes' proof of a prima facie case against Midlantic as the result of its payment on forged checks was sufficient to sustain a punitive damage award even though the Bank's affirmative defenses defeated his recovery of compensatory damages. We hold that it would be inappropriate for us to "deem ... [the judge] to have made a finding in accord *72 with the judgment" when he clearly declined to make a finding on the issue because he was of the opinion that such a finding was not necessary to sustain the judgment. See Cullen v. Margiotta, 811 F.2d 698, 731 (2nd Cir.), cert. den. 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987) (Under the almost identically worded F.R.C.P. 49a, it would be inappropriate to deem the trial court to have made a finding as to an omitted issue when the trial court expressly disavowed making a finding.); Wood v. Old Sec. Life Ins. Co., 643 F.2d 1209, 1215 (5th Cir.1981) (Same).
However, a remedy is available to correct the omission without a new trial on the issue of whether Sykes suffered harm as the result of Midlantic's conduct. By virtue of R. 4:39-1, "If ... the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issues so omitted unless before the jury retires he demands its submission to the jury." In the present case, of course, there was no such demand. Since, as we have said, there is sufficient evidence in the record to justify, but not to require, a finding of harm to Sykes from Midlantic's actions, we will remand the case to the trial judge for a finding on this issue. See Cullen v. Margiotta, supra, at 731; Wood v. Old Sec. Life Ins. Co., supra, at 1215-1216. If he finds that there was harm, the judgment for punitive damages will stand; if he finds that no harm resulted, the judgment for punitive damages should be vacated.

II

Sykes' Claims Against Dean Witter
The trial court ruled that the defense of "in pari delicto" barred Sykes' claims against Dean Witter based on common law fraud and violation of the Uniform Securities Law, N.J.S.A. 49:3-52 and following, but not his breach of contract claim. Dean Witter insists that the jury's finding that Sykes was "in pari delicto" with Murray defeats all of Sykes' causes of action *73 against it except for his negligence claim. For the following reasons, we hold that the in pari delicto doctrine is not a defense to any of Sykes' claims for compensatory damages against Dean Witter.
One of the special interrogatories submitted to the jury asked, "Was plaintiff John Sykes in pari delicto?" The court instructed the jury as follows on the meaning of that interrogatory:
If you should find that as a direct result of his own actions, the plaintiff John Sykes bears at least substantially equal responsibility for the violation he seeks to redress and the preclusion of this suit would not interfere with the effective enforcement of the securities law and protection of the investing public, then you would answer this question yes. If not so persuaded, you would answer it no.
We assume that the jury followed the instruction as given. Consequently, its affirmative answer to the special interrogatory imported only that Sykes "bears at least substantially equal responsibility for the violation he seeks to redress," not that he conspired with Murray to defraud third parties or was equally culpable for some other reason.
The expression "in pari delicto" is a portion of the longer latin sentence, "In pari delicto potior est conditio defendentis," which means that where the wrong of both parties is equal, the position of the defendant is the stronger. Annotation, Purchaser's Right to Set Up Invalidity of Contract Because of Violation of State Securities Regulation as Affected by Doctrines of Estoppel or Pari Delicto, 84 A.L.R.2d 479, 491 (1962). Black's Law Dictionary (5th Ed. 1979) at 1004, defines "pari delicto" as follows:
In equal fault; in a similar offense or crime; equal in guilt or in legal fault. "Pari delicto" doctrine rests on [the] rule that courts will not enforce an invalid contract and that no party can recover in any action where it is necessary for him to prove an illegal contract in order to make out his case. [citation omitted]
That is the meaning with which the phrase has been used by New Jersey courts. For example, where a borrower knowingly conspired with a lender to violate the small loan law, the borrower was held in pari delicto with the lender and *74 therefore not entitled to be relieved from the consequences of his default on his loan. Ryan v. Motor Credit Co., Inc., 132 N.J. Eq. 398, 28 A.2d 181 (E. & A. 1942). To the same affect see Cameron v. International Alliance Of Theatrical Stage Employees, Local 384, 118 N.J. Eq. 11, 20, 176 A. 692 (E. & A. 1935); Marx v. Jaffe, 92 N.J. Super. 143, 146-147, 222 A.2d 519 (App. Div. 1966). However, the victim of a fraud is not in pari delicto with his victimizer, not even if the victim was deceived into thinking that he was defrauding a third-party. Cf. Crossley v. Moore, 40 N.J.L. 27, 35 (Sup.Ct. 1878).[2]
In the present case, it would be a perversion of public policy to hold, as Dean Witter urges us to do, that Sykes' gullibility and cupidity relieved Murray or his employer from their obligation to repay the losses resulting from his fraud. Cf. Peter W. Kero, Inc. v. Terminal Const. Corp., 6 N.J. 361, 369-370, 78 A.2d 814 (1951) ("It is the policy of the law to protect the unwary and foolish as well as the vigilant from the wiles and artifices of evil-doers and negligence in trusting a representation will not, according to the greater weight of authority, excuse a positive willful fraud...."); Pioneer Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 342, 382 A.2d 933 (App.Div. 1978), aff'd 78 N.J. 320, 394 A.2d 360 ("One who engages in the kind of conduct here involved may not urge that his victim should have been more circumspect or astute."); Schoharie County Coop. Dairies, Inc. v. Eisenstein, 22 N.J. Super. 503, 514, 92 A.2d 390 (App.Div. 1952) ("It must be kept in mind that the law *75 leans toward protecting even the foolishly credulous against the machinations of those who would defraud.") Because there is no evidence to support the conclusion that Sykes conspired with Murray to defraud third parties or was equally culpable with him for some other reason, we hold that the jury's in pari delicto finding is not a bar to any of Sykes' claims for relief. To the same effect, see McAdam v. Dean Witter Reynolds, Inc., supra, 896 F.2d at 756-758.
However, we agree with the trial court that Sykes was not entitled to recover for a violation of the New Jersey Consumers Fraud Act, N.J.S.A. 56:8-2 and N.J.S.A. 56:8-19, because a fraud in the sale of shares of stock or other securities is not within the compass of that statute. In Neveroski v. Blair, 141 N.J. Super. 365, 377, 358 A.2d 473 (App.Div. 1976), we traced the legislative history of the Consumers Fraud Act as follows:
When the Consumer Fraud Act was first adopted in 1960 "merchandise" was defined in § 1 as "any objects, wares, goods, commodities or services." L. 1960, c. 39, § 1(c). In 1967, a bill was introduced expanding the definition of "merchandise" to include "any objects, wares, goods, commodities, real estate, securities, services or anything offered directly or indirectly to the public for sale." Assembly Bill 715, introduced March 13, 1967. Prior to passage of this bill however it was amended by deleting the words "real estate, securities" and was finally adopted in that deleted form.
In a footnote to that opinion, we pointed out
that on January 19, 1976, § 2 of the Consumer Fraud Act was further amended to provide that the use of any of the prohibited tactics "in connection with the sale or advertisement of any merchandise or real estate" shall constitute an unlawful practice bringing into play the statutory penalties.
The statute has not been amended since that time to include "securities."
We agree with In re Catanella and E.F. Hutton and Co., Inc. Securities Litigation, 583 F. Supp. 1388, 1441-1444 (E.D. Pa. 1984), that that legislative history demonstrates that the Consumer Fraud Act was not intended to create a cause of action for fraud in connection with the sale of securities. The claims upon which Sykes is entitled to recover compensatory damages from Dean Witter are therefore those based on negligence, *76 common law fraud[3], breach of contract, and violation of N.J.S.A. 49:3-71, the civil liabilities section of the Uniform Securities Law.
The amount of the principal and interest to which Sykes is entitled from Dean Witter may be affected by the legal theory on which his recovery is based. As the trial court properly provided in the judgment which it entered, Sykes' recovery for negligence must be reduced to reflect the jury's finding that he was 30 percent negligent. His recovery for violation of N.J.S.A. 49:3-71 may be limited by the effect of its limitations provision. Prior to the effective date of the amendment of that section by L. 1985, c. 405, § 14, it read, "No person may sue under this section more than 2 years after the contract of sale."[4] Sykes' complaint was filed April 10, 1984. Accordingly, he would not be entitled to recover on the basis of that statute for transactions which occurred before April 10, 1982.
The trial court ruled that if Sykes elected to recover on a breach of contract theory, he would be entitled to interest at the rate which he would have earned on the tax-free money market fund in which he had money invested. Sykes claims that he was entitled to interest at a higher rate because his recovery in this law suit will be taxable as ordinary income. Although we will not attempt to decide the question whether Sykes' recovery will be taxable, we hold that the trial judge's allowance of interest on Sykes' recovery for breach of contract, and the rate applied, was within his discretion. The trial judge also ruled that Sykes was entitled to prejudgment interest on *77 his recovery based on Dean Witter's negligence at the rates provided by R. 4:42-11(b) for recoveries in tort actions. We agree with that ruling also. However, in view of our holding that Sykes' recovery on his fraud claim is not barred by the in pari delicto defense, those rulings are probably moot because Sykes will be entitled to prejudgment interest on his recovery for fraud at the rates fixed by R. 4:42-11(b), and his damages for fraud are not subject to reduction to reflect the jury's comparative negligence finding.
By motions for judgment notwithstanding the jury's verdict or, alternatively, for a new trial, Sykes argued that he was entitled to compensatory damages, not just for $167,000, the amount of the Dean Witter checks paid on forged endorsements, but, in addition, the $30,000 which he claims to have given Murray in cash, the $40,000 which Murray took from two pay checks given to him to deposit in Sykes' brokerage account, and the net amount of the other funds which Sykes transferred to Murray from his brokerage account by proper endorsements of the Dean Witter checks.
Sykes' negligence claim against Dean Witter was premised on the theory that Murray's activities were negligently supervised by his superiors. Sykes' claims for breach of contract, common law fraud, and violations of the Uniform Securities Law were all based on proof that Murray misappropriated funds which Sykes entrusted to him in reliance on his fraudulent misrepresentations that the funds were being invested in a Dean Witter New York Special Situations Fund. The validity of his claims against Dean Witter do not depend on whether Murray obtained control of Sykes' funds by forged endorsements.
If there is a rational basis for the limitation of Sykes' recovery against Dean Witter to the amount charged against his account for checks transferred on forged endorsements, that basis could only be the jury's doubt about the amount which Sykes claimed to have entrusted to Murray. The only *78 evidence for Sykes' claim to have given him $30,000 cash was Sykes testimony. He offered no receipts or other objective evidence. But there was objective evidence to corroborate his testimony about all or most of the balance of the funds entrusted to Murray in excess of the $167,000 transferred by forged endorsements. To corroborate Sykes' testimony that he transferred to Murray $40,000 taken out of Sykes' pay checks, Sykes showed two payroll account checks payable to himself from his employer, John Sykes Co., totaling $78,420.16. An employee of Midlantic National Bank/South identified these two checks on the basis of a bank employee's initials, and testified that Murray cashed the checks at Midlantic's Ventnor Heights office, receiving currency and a cashier's check in return. The retained carbon copy of a January 13, 1982 cashier's check for $38,420.16, payable to Sykes, and Sykes' January 1982 brokerage account statement showing a deposit of $38,420.16 were introduced into evidence. To corroborate his testimony about the other checks which he endorsed and gave to Murray, Sykes introduced the checks, some of which were identified as having been cashed by Murray at Midlantic's Ventnor Heights office, and his brokerage account statements showing that amounts corresponding to the checks were charged against his brokerage accounts with the explanation, "funds paid." Although Sykes was cross-examined vigorously and his credibility affected in some respects, no affirmative testimony was presented to dispute his claims.
Proof of Sykes' claim to having transferred the $30,000 cash depended entirely on his credibility and the jury was therefore entirely free to reject it. However, his claims based on the other transfers could rationally be rejected only if the jury doubted the testimony of the bank employees or believed that after cashing the various checks, Murray returned some or all of the proceeds to Sykes. But the credibility of the bank witnesses was not attacked and there was no evidence that Sykes received a rebate of some or all of the proceeds of his pay checks or of the checks charged to his account.
*79 In his oral opinion denying Sykes' motions, the trial judge said:
Do I believe Mr. Sykes, at the importuning of Mr. Murray, brought in $30,000 in cash, thinking, in essence, he was dealing with a bank? I do. But the jury was equally free to disregard that.
With regard to the checks with the plaintiff's signature thereon, it is more problematic, but the jury was the one, I think, who was entitled to evaluate the proofs and reach the conclusions which they did.
In short, there does not appear clearly and convincingly a miscarriage of justice as opposed to a dispute with the result.[5]
A motion for judgment notwithstanding the verdict of a jury must be denied
if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ.... The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion.
Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969). In Caliguire v. City of Union City, 104 N.J. Super. 210, 217, 249 A.2d 603 (App.Div. 1967), aff'd 53 N.J. 182, 249 A.2d 577 (1969), quoting from Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y., 22 N.J. 482, 126 A.2d 323 (1956), we described the following as the criteria for deciding a motion for judgment which depends on the credibility of a key witness:
Where men of reason and fairness may entertain differing views as to the truth of testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such a character is for the jury. [Citations omitted] But when the testimony of witnesses, interested in the event or otherwise, is clear and convincing, not incredible in the light of general knowledge and common experience, not extraordinary, not contradicted in any way by witnesses or circumstances, and so plain and complete that disbelief of the story could *80 not reasonably arise in the rational process of an ordinarily intelligent mind, then a question has been presented for the court to decide and not the jury.
To the same effect, see Johnson v. Salem Corp., 97 N.J. 78, 89, 92-93, 477 A.2d 1246 (1984). We cannot say, on the basis of those criteria, that the trial court erred by denying Sykes' motion for judgment notwithstanding the verdict.
However, a motion for a new trial "may be properly granted although the state of the evidence would not justify the direction of a verdict." Dolson, supra, 55 N.J. at 6, 258 A.2d 706. R. 4:49-1 directs that "The trial judge shall grant the motion [for a new trial] if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." According to Dolson,
The standard governing an appellate tribunal's review of a trial court's action on a new trial motion is essentially the same as that controlling the trial judge. Hager v. Weber, 7 N.J. 201, 212 [81 A.2d 155] (1951) very correctly so held, at the same time putting to rest all constitutional questions and casting aside any more restrictive "abuse of discretion" test. We say the test is "essentially the same", because where certain aspects are important  witness credibility, "demeanor", "feel of the case", or other criteria which are not transmitted by the written record , the appellate court must give deference to the views of the trial judge thereon. His decision, however, is not entitled to any special deference where it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record with respect to which he is no more peculiarly situated to decide than the appellate court. 55 N.J. at 7, 258 A.2d 706.
Our careful review of the record leads us to the conclusion that the jury's verdict limiting Sykes' compensatory damages against Dean Witter to $167,000 resulted from a "clear error or mistake by the jury" and constitutes a "manifest miscarriage of justice" which requires judicial action. Baxter v. Fairmont Food Co., 74 N.J. 588, 597-599, 379 A.2d 225 (1977); see Rivera v. Westinghouse Elevator Co., 209 N.J. Super. 543, 548-549, 508 A.2d 264 (App.Div. 1986), aff'd 107 N.J. 256, 526 A.2d 705 (1987); Jenoff v. Gleason, 215 N.J. Super. 349, 359-360, 521 A.2d 1323 (App.Div. 1987) The case must therefore be remanded for a new trial solely on the issue of the amount of *81 compensatory damages which Sykes is entitled to recover against Dean Witter.
The judgment of the trial court is affirmed insofar as it holds that Sykes has no cause for action against Morgan Guaranty Trust Company and that, in accordance with the jury's findings, he is not entitled to compensatory damages against Midlantic National Bank/South. The case is remanded to the trial court to find as a fact on the basis of the existing record whether the conduct of Midlantic contributed to causing him harm. If the court finds that it did, the judgment for punitive damages against Midlantic National Bank/South will stand; otherwise, that provision of the judgment should be vacated. Insofar as the judgment adjudicates Sykes' claim against Dean Witter Reynolds, Inc., it is reversed and remanded for a new trial in accordance with this opinion solely on the issue of the amount of Sykes' compensatory damages.
NOTES
[1] The following are the only special interrogatories submitted to the jury relevant to the issue of whether Sykes suffered "harm, injury, loss, or detriment," Nappe, supra, 97 N.J. at 51, 54, 477 A.2d 1224, as the result of the Bank's conduct:

[Question] Did defendants Dean Witter Reynolds and Midlantic engage in a conspiracy to defraud John Sykes?
[Answer] No.
[Question] If [the previous question is] answered "yes" what if any damages resulted therefrom?
[This question was unanswered.]
[Question] Did defendant Midlantic pay any check(s) on any unauthorized endorsement?
[Answer] Yes.
[Question] If answered "yes" what if any damages resulted therefrom?
[Answer] $167,000.
The next series of interrogatories asked the jury for findings of fact relevant to the banks' affirmative defenses to liability for paying checks on forged endorsements. The last two special interrogatories, and their answers, read:
[Question] Is plaintiff John Sykes entitled to punitive damages against Midlantic?
[Answer] Yes.
[Question] If "yes", what amount do you award?
[Answer] $166,000.
[2] Professor Corbin makes the point as follows:

The "Buckfoot gang" were defrauders by profession who induced simpletons to wager money on a foot race by assuring them that it was "fixed" in their favor, when it was in fact "fixed" against them. Although the simpleton expected to win by defrauding third-persons, he was himself the only defrauded party. It was held in some cases that the simpleton was entitled to restitution. Although he had a dishonest purpose, he had in fact defrauded no one; the inexperienced victim was not as bad as the wily professionals and a judgment for restitution was thought to be consistent with the public welfare. [footnote omitted]
6A Corbin, Contracts, (1962) § 1.536 at 823-824.
[3] Dean Witter has not disputed that it is derivatively liable for damages resulting from Murray's securities frauds. See Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 338-339, 173 A.2d 258 (1961); Gardner v. Rosecliff Realty Co., 41 N.J. Super. 1, 9, 124 A.2d 30 (App.Div. 1956).
[4] The limitation provision as amended reads, "No person may sue under this section more than two years after the contract of sale, or within two years of the time when the person aggrieved knew or should have known of the existence of his cause of action, whichever is later."
[5] In a discussion of the factors which affected the allowance of pre-judgment interest, the trial judge said:

... as I've indicated, while the jury was free to reach the result they did, this Court as an independent finder of fact, would have found the $283,000 figure, because I believed Mr. Sykes when he said that which he did concerning the moneys which he invested with Clifford Murray and the special situation.