629 So.2d 161 (1993)
BATTAGLIA PROPERTIES, LTD., Appellant,
v.
FLORIDA LAND AND WATER ADJUDICATORY COMMISSION, et al., Appellees.
No. 92-88.
District Court of Appeal of Florida, Fifth District.
October 1, 1993.
Rehearing Denied January 7, 1994.
*162 Miranda F. Fitzgerald and Karen M. Connell of Maguire, Voorhis & Wells, P.A., Orlando, for appellant.
Robert A. Butterworth, Atty. Gen., and Kathleen E. Moore, Asst. Atty. Gen., Tallahassee, for appellee Florida Land and Water Adjudicatory Com'n.
Joel D. Prinsell, Asst. County Atty., Orlando, and Herbert A. Langston, Jr., City Atty., Maitland, for appellees Orange County, and City of Maitland.
W. SHARP, Judge.
Battaglia Properties, Ltd. appeals from a final administrative order of the Florida Land and Water Adjudicatory Commission which approved a development order pertaining to Battaglia's property known as "Lakepointe." Battaglia contends that certain conditions in the order imposed on the Lakepointe development are unduly restrictive and violate constitutional provisions protecting private property.[1] The record below demonstrates that the conditions in the development order are designed to make the project compatible with surrounding residential areas, and thus harmonious and consistent with the Orange County Growth Management Policy and the City of Maitland's Growth Management Plans, for those surrounding areas. Thus, the conditions imposed by the order are not arbitrary or unreasonable. Accordingly, we affirm.
This proceeding began when Battaglia Properties, Ltd. sought to develop Lakepointe, a vacant tract of land of about 120 acres located in unincorporated Orange County. The property is surrounded by the City of Maitland on three sides. Interstate 4, a major interstate highway, lies about one quarter of a mile to the West. Maitland Boulevard, a four-lane highway running east to west, bisects the property into northern and southern portions.
The southern portion of the property was the subject of a prior zoning proceeding. Battaglia's planned development was ultimately upheld by this court, primarily on jurisdictional grounds. Battaglia Fruit Company v. City of Maitland, 530 So.2d 940 (Fla. 5th DCA), rev. denied, 537 So.2d 568 (Fla. 1988). Both the southern and larger northern portions of Lakepointe had to be included in Battaglia's current request filed with the East Central Florida Regional Planning Council because the magnitude of the project made it one of regional impact or a "DRI."
Battaglia's master plan for Lakepointe proposed multifamily, office and commercial development, including a restaurant and bank. Under the proposed master plan, the property is divided into six parcels. Parcels 1 and 2 are located between Maitland Boulevard and Sandspur Road. Parcels 3 through 6 are located in the northern portion of Lakepointe.
*163 The property was zoned low density single family residential. The areas surrounding the property are currently zoned low density residential. The area surrounding Lakepointe contains single family homes and vacant land, although there is one multifamily development, a church, a community center, a school, and a residential-type office building.
The East Central Florida Regional Planning Council recommended approval of Battaglia's development plan, with some of the challenged conditions. The Board of Orange County Commissioners held public hearings on the matter. It adopted an ordinance amending the Orange County Comprehensive Plan to accommodate the development and approved the necessary rezoning from R-1AA to PD. The Board also imposed certain conditions for the project, including prohibiting freestanding commercial structures, limiting the height of office buildings to thirty-five feet, requiring that the design of the office buildings be of a "residential scale and character," and limiting office structures to 10,000 square feet per acre.
Battaglia filed a notice of appeal from the development order with the Florida Land and Water Adjudicatory Commission. The appeal was referred to a hearing officer who conducted a four-day de novo hearing. The hearing officer recommended approval of the development order but increased the maximum height for office buildings in parcel 5 from thirty-five to fifty feet. She upheld the County's elimination of freestanding commercial use, the limitation on office square footage, and continued the use of the term "residential scale and character" for the design of office buildings. After considering the recommended order and exceptions filed by the parties, the Commission approved the recommended order but restricted the height in all parcels to thirty-five feet.
On appeal to this court, Battaglia objects to the following conditions in the development order which apply primarily to the northern portion of the project:[2] 1) elimination of freestanding commercial use and the requirement that commercial use be contained within office buildings; 2) limitation of office square footage to 10,000 per acre; 3) the requirement that office buildings be of a "residential scale and character";[3] and 4) imposition of a thirty-five foot height requirement on office structures. Battaglia argues that these conditions are unduly restrictive or are arbitrary and capricious, thus constituting a taking without payment of full compensation as required by law.
Because the Lakepointe project would have a substantial effect on the health, safety, or welfare of citizens of more than one county, Battaglia was required to obtain a "Development of Regional Impact" approval order pursuant to chapter 380. Under the procedures outlined in chapter 380, the developer must first file an application for a development permit with the appropriate local zoning authorities. § 380.06(6), Fla. Stat. (1991). This application must request DRI and local zoning approval. Manatee County v. Estech Gen. Chem. Corp., 402 So.2d 1251 (Fla. 2d DCA 1981), rev. denied, 412 So.2d 468 (Fla. 1982). Following review and a public hearing, the local government may deny or approve the application with conditions, restrictions or limitations. An aggrieved developer may then appeal to the Florida Land and Water Adjudicatory Commission. § 380.07, Fla. Stat. (1991). Following an administrative hearing, the Commission may grant or deny permission to develop and may *164 attach conditions and restrictions to its decision.
Although it is not expressly stated, chapter 380 requires a balancing of the interests of the state in protecting the health, safety, and welfare of the public against the constitutionally protected interests of the private property owner. Graham v. Estuary Properties, Inc., 399 So.2d 1374 (Fla.), cert. denied, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981); Fox v. Treasure Coast Regional Planning Council, 442 So.2d 221 (Fla. 1st DCA 1983). Chapter 380 specifically provides that:
Nothing in this chapter authorizes any governmental agency to adopt a rule or regulation or issue any order that is unduly restrictive or constitutes a taking of property without the payment of full compensation, in violation of the constitutions of this state or of the United States.
§ 380.08(1), Fla. Stat. (1991).
In Snyder v. Board of County Commissioners, 595 So.2d 65 (Fla. 5th DCA 1991), jur. accepted, 605 So.2d 1262 (Fla. 1992), this court recognized that the most valuable aspect of the ownership of property is the right to use it and that any infringement on the owner's full and free use of his property, whether the result of physical limitations or government restrictions, is a limitation on and a diminution of the value of the property and accordingly triggers constitutional protections. All incidents of property ownership are protected from infringement by the state unless the regulations are reasonably necessary to secure the health, safety, and welfare of the public.
Snyder then distinguished the types of government action and applicable standards of review. The enactment of general comprehensive zoning and planning ordinances, maps, and amendments is legislative action subject to the "fairly debatable" or deferential standard of review by courts.
However, subsequent governmental action which involves the proper application of the general rule of law to a particular piece of property does not constitute legislative action requiring a deferential standard of review. Rather, governmental action in the application of general laws limiting or restricting the use of property impacts basic property rights under the constitution and requires close judicial scrutiny. The initial burden is upon the landowner to demonstrate that his petition for use of privately-owned lands complies with the reasonable procedural requirements of the ordinance and that the proposed use is consistent with the applicable comprehensive zoning plan. Upon such a showing, the landowner is presumptively entitled to use his property in the manner he seeks unless the opposing governmental agency proves by clear and convincing evidence that a specifically stated public necessity requires a specific, more restrictive use. After such a showing, the burden shifts to the landowner to assert and prove that the more restrictive land use constitutes a taking of his property for which he is entitled to compensation under the constitution. 595 So.2d at 81.
In the present case, the Master Development Plan submitted by Battaglia proposed office, commercial (including a bank and restaurant), and multifamily development for the site and did not contain any provisions for single family residential development. This constitutes a much increased density use for the land than was possible under the prior single family residential zoning. Accordingly, it was necessary to amend the Orange County Comprehensive Plan to accommodate the project.[4] The Board did so, but added conditions aimed at buffering and limiting the impact of the project on the surrounding neighborhoods, which were primarily residential. Both the County's and the City of Maitland's plans showed these areas are designed to remain residential.
The issue in this case, in contrast to Snyder,[5] is not whether the rezoning was *165 consistent with the Comprehensive Plan, because the plan itself was changed to accommodate the Lakepointe development. The new zoning, or P.U.D., incorporates and includes the conditions to which Battaglia objects as essential parts of the rezoning. Without them, the development order would not have been approved.
Thus, in this case, we are being asked to review the propriety of an "[i]nitial zoning enactment(s) and comprehensive rezoning(s) or rezonings affecting a large portion of the public"...[6] This is "legislative in character."[7] And, pursuant to Snyder, the standard for review by the courts is limited to determining whether the rezoning (i.e., imposition of the objected to conditions) is unreasonable and arbitrary. See Florida Land Co. v. City of Winter Springs, 427 So.2d 170 (Fla. 1983). Since this is the first court review of a zoning decision made by a complex but purely administrative process, we are in the same posture as a circuit court reviewing the zoning decision of a county board or zoning commission.
The hearing officer justified the conditions as based in part on the following commercial policies from the Orange County Growth Management Policy:
B. COMMERCIAL POLICIES (Policies outlined in Sections 1.0 through 4.0 are applicable to all types of commercial activities within Orange County).
1.0 GENERAL

1.0.1 The County will encourage the concentration of expanded commercial facilities in centers suitably located to provide their market areas with accessibility and to discourage inappropriate roadway strip commercial uses. Uses generally considered as a suitable replacement for strip commercial activities include all types of residential uses, institutional development, or recreation areas and green belts.
* * * * * *
11.0 OFFICES AND PROFESSIONAL COMMERCIAL POLICIES

Offices and professional commercial developments are those which provide office space for the furnishing of professional services. Such uses may be located individually or in planned centers, such as office parks.
11.1 Location and Compatibility

11.1.1 Large office uses should generally locate adjacent to arterial thoroughfares that connect to an interstate or expressway in order to lend accessibility to a wider market area.
11.1.2 Smaller office uses should generally utilize principal or minor arterials for site access and location.
11.1.3 Office parks should be encouraged to include corollary uses such as office supply stores, banks, restaurants, conference centers and other compatible business and commercial uses.
11.1.4 Office uses are compatible with adjacent community and regional commercial shopping areas and may provide a buffer between these shopping areas and nearby residential areas.
11.1.5 Professional service office parks should locate on major collectors and minor arterials.
The hearing officer also found the following residential policies relevant:
3.0 LOCATION AND COMPATIBILITY

3.1 General

3.1.1 Residential areas shall be buffered from major transportation arteries, and from commercial and industrial land uses which are not compatible with residential development. New commercial development will be discouraged where there would be a detrimental impact on existing residential properties due to excessive noise, pollution, traffic congestion, unsafe highway conditions or where an unacceptable physical intrusion into residential neighborhoods would be created.
* * * * * *

*166 3.1.3 Land development controls should ensure that future development which may allow a greater intensity of use is compatible with existing development.
The evidence below supports the conclusion that the challenged conditions to Battaglia's development plan were necessary to make the project compatible with its surroundings and not threaten the balance of the County's Growth Management Plan for those areas. Regarding the prohibition against freestanding commercial use, Edward Williams, the Orange County Planning Director, testified that such use was totally inconsistent with the County's Comprehensive Plan because: 1) it was inconsistent with the Future Land Use Policy Guide Map; 2) it was inconsistent with the locational criteria for retail uses; and 3) it would start a trend for additional retail development that would have an adverse impact on the surrounding residential areas and therefore would be inconsistent with the overriding goals and objectives of the Growth Management Plan.
Williams cited commercial policy 4.0.1 in support of prohibiting freestanding commercial use. This policy provides that "[a]ll commercial development shall be established only in areas where adequate public facilities and services already exist, will be provided prior to occupancy, or are scheduled to be available within an approved time frame, as provided in the Growth Management Policy." Williams testified that there were circumstances where adequate public facilities and services would not be available for the Lakepointe Development.
Williams also testified that freestanding commercial use at Lakepointe was counter to commercial policy 1.0.2 which provides as follows:
The disruption of residential areas by poorly located commercial activities should be avoided. In particular, the County will consider prohibiting commercial development on all quadrants at major road intersections where such development would have a detrimental impact on nearby residential neighborhoods or where the location of commercial activities would unduly disrupt or overburden the flow of traffic on existing and proposed transportation facilities.
Under the Orange County Growth Management Plan, the area west of 1-4 has been designated as an "activity center"[8] where high density, high intensity uses will be encouraged so they do not locate in established single family, residential areas. Freestanding commercial use is appropriate in these activity centers. But it is not appropriate for areas east of 1-4, where Lakepointe is located.
Williams testified that the Orange County Growth Management Policy's Future Land Use Designation for the Lakepointe property had been low density, residential, which allowed residential developments up to 4.4 dwelling units per acre. Thus, Battaglia's proposal for office and freestanding commercial use and for multifamily development in the northern part of the project was actually inconsistent with the Map[9] and Comprehensive Plan, prior to its amendment.
Williams further testified that it was a stated goal and objective of the County to ensure intergovernmental coordination. Witnesses testified that according to Maitland's Comprehensive Development Plan, the southern portion of Lakepointe is an area established primarily for single family residential and related uses, utilities, churches and schools. Office buildings would not be approved by the City in this area. The northern portion of Lakepointe is in an area designated for single family, multifamily and limited, nonresidential development. Freestanding commercial use would not be allowed under Maitland's Comprehensive Development Plan. Like Orange County, Maitland[10] *167 is attempting to preserve the area east of 1-4 for residential use.
The condition limiting commercial and office development on the project to a cap of 10,000 square feet per acre also was not shown by this record to be arbitrary, capricious, or unsupported by the evidence. Both parties acknowledge a planned development such as Lakepointe does allow for a square footage restriction. David Tomek, Community Development Director for Maitland, testified that 10,000 square feet would be the maximum square footage allowed in Maitland, which surrounds Lakepointe on three sides. Edward Williams testified that Orange County conducted a review of office projects and determined that 10,000 square foot per acre was an average limitation. The staff recommended 10,000 square feet because that was slightly higher than what had been approved for the southern portion of Lakepointe and because it was an average figure for professional office buildings in Orange County. Williams further testified that a 10,000 square foot per acre limitation kept office space at a scale and character consistent with a residential atmosphere. The Jewish Community Center, located nearby, was limited to less than 9,000 square feet per acre. This evidence supports the conclusion that the 10,000 square-foot limitation for office space is reasonably related to the requirement that the project retain a residential character.
As to the third condition that office buildings be of a "residential scale and character", Battaglia itself used this design term in seeking community and County approval for the rezoning of the southern portion of Lakepointe. Battaglia advised nearby residents that it planned a development with office buildings similar to the Crown Oaks Development which apparently has a residential feel to it. The office buildings proposed by Battaglia were meant to look like homes. James Sellen, Battaglia's expert, testified that "residential scale and character" had certain distinguishing characteristics such as pitched roofs, the materials that were used were similar to the materials used in housing construction and that the height limitation was the same as that used for single family residential districts.
The City of Maitland and Orange County apparently had the same concept in mind for application to the northern portion of Lakepointe. Marilynne Davis, the former City Manger, testified that the term "residential scale and character" had been in use in Maitland for some time and identified nearby Versailles Office Park as being one example of this style. Edward Williams, the County Planning Director, testified that residential scale related to size and height requirements and that residential character referred to a certain sense of community and residential feel. Williams further described this design as creating a residential atmosphere through the style of buildings, landscaping which would hide parking, type of roof, windows, and building materials common to housing developments. Williams noted that the elements in determining whether a project would be of residential scale and character included the amount of square footage on the parcel, the size and shape of the buildings, the pitch of the roof, the type of materials, whether the structure resembles a single family house, an abundance of landscaping and other amenities, less parking, canopies over the windows, and other elements that would create the illusion that the building may be a residential unit.
Thus it appears that Battaglia, the County and City of Maitland have the same concept of residential scale and character and this concept may be implemented in a variety of design configurations. The southern portion of Lakepointe was rezoned with the condition that the office buildings be of residential scale and character, and Battaglia apparently did not object. It appears reasonable to impose the same conditions on the northern portions of Lakepointe. The rationale is clearly to protect the surrounding, already-established, residential neighborhoods from incompatible development.
*168 The fourth condition challenged by this appeal is the 35-foot height limitation reimposed by the Commission. The Commission regarded the hearing officer's finding that the 35-height restriction "does not make sense in parcel 5" as a conclusion of law and disagreed with the hearing officer on this matter. The Commission noted that Lakepointe is virtually surrounded by Maitland, that Maitland's Comprehensive Development Plan and Zoning Code set a height limitation for office development east of 1-4 at 35 feet, that the 35-foot height restriction preserves the single family residential character of the area and that neighboring homeowners opposed a height on the project of 35 feet.
Battaglia argues that the hearing officer's finding that the 35-foot height restriction does not make sense for parcel 5 was indeed a finding of fact which was supported by the evidence and thus should not have been overturned by the Commission. Both parties acknowledge that an agency may not reject or modify findings of fact if they are based on substantial, competent evidence. § 120.57(1)(b)(10), Fla. Stat. (1991); Kinney v. Department of State, 501 So.2d 129 (Fla. 5th DCA 1987). However, neither the agency nor the court is bound by the labels affixed to findings of fact and conclusions of law. If a conclusion is improperly labeled as a finding of fact, the label is disregarded and the item is treated as though it were properly labeled. Kinney. An agency, however, may not disregard the hearing officer's findings of fact by simply characterizing the finding as a conclusion of law. Kinney.
Here the hearing officer's determination that a 35-foot height restriction "did not make sense for parcel 5" is a conclusion rather than a finding and was properly set aside by the Commission. James Sellen, Battaglia's expert, admitted that professional office zoning regulations in Orange County restricted the height of buildings to 35 feet and that a special exception would be needed for taller buildings. Although this is not a straight zoning or rezoning request, the height restrictions for professional office buildings in Orange County is clearly relevant.
County Commissioner Vera Carter testified that Orange County wanted development on the east side of 1-4 to be residential and that a 35-foot height requirement was more compatible with the residential character of the area. Edward Williams testified that professional office regulations in Orange County provided for a 35-foot height maximum and that Orange County had limited buildings in other projects to 35 feet in height. Williams noted that the lakes in the development are a separation buffer but do not provide a visual barrier for nearby residents. The City of Maitland does not allow buildings east of 1-4 to exceed 35 feet in height because it would be inconsistent with its plan to develop the area east of 1-4 as a residential area. The 35-foot height requirement appears to be reasonably related to the stated policies of both Orange County and Maitland, to preserve the residential nature of the area.
In sum, the conditions imposed by Orange County's rezoning for the Lakepointe project appear to be rationally related to maintaining a residential feel and atmosphere for the project. Similar limitations have been imposed by the County for commercial developments for similar reasons. In this case, the primary justification for the conditions was to preserve the residential character of the surrounding areas, and thereby preserve the integrity of both Orange County's and the City of Maitland's comprehensive zoning plans for the areas immediately adjacent to this large-scale development project.
Because they were based on competent and substantial evidence presented below, we conclude the challenged conditions are not unreasonable and arbitrary. Bell v. City of Sarasota, 371 So.2d 521 (Fla. 2d DCA 1979). Nor were the conditions shown to unduly restrict Battaglia's use of the land, so as to constitute an unconstitutional taking of property by depriving the owner of a reasonably economically viable use of the land. Prior to the rezoning, Battaglia would have been limited to building single family dwellings. The options under the new PUD zoning are considerably broader and more economically advantageous, *169 even with the challenged conditions.[11]
AFFIRMED.
GOSHORN, J., concurs specially in result, with opinion.
COWART, J.A., Jr., Senior Judge, dissents, with opinion.
GOSHORN, Judge, concurring specially.
While I concur in the result reached by Judge Sharp, I write to express my disagreement with the standard of review applied. Judge Sharp labels the conditional zoning changes, made to accommodate the appellant's permit request, as "comprehensive" or "affecting a large portion of the public," "legislative in character," and susceptible of the "fairly debatable" standard of review.
In Snyder v. Board of County Commissioners, 595 So.2d 65 (Fla. 5th DCA 1991), juris. accepted, 605 So.2d 1262 (Fla. 1992), this court concluded that there are two types of rezoning actions, legislative and not legislative, i.e., executive, judicial, or quasi-judicial. Legislative actions are policy-setting actions and include initial zoning enactments, comprehensive rezoning, or rezonings affecting a large portion of the public. Where a zoning or rezoning decision constitutes legislative action, the reviewing court must apply a deferential standard of review. Non-legislative actions are those rezoning actions which impact on a limited number of people or property owners. Changes in zoning maps following the application of the legislated zoning law to a specific parcel of land as a consequence of a decision on a particular application by a particular owner is a non-legislative action. Id. at 75. In short, non-legislative actions are policy application decisions, not policy setting decisions, and are to receive close judicial scrutiny.
In this case, the appellant sought approval to develop approximately 120 acres of its land. The Orange County Commissioners conditionally amended the comprehensive plan and approved the necessary rezoning to accommodate the permit request. This action seems to me to fall within the second, non-legislative type of rezoning as set forth in Snyder. Accordingly, the conditional rezoning changes in this case should receive close judicial scrutiny. Applying that standard, I concur in the result reached by Judge Sharp.
COWART, J.A., Jr., Senior Judge, dissenting.
The specially concurring opinion is certainly correct in that zoning action relating specifically to one parcel of land under one ownership is not legislative action. Legislative action in the zoning field should be similar to the passage of a general statute as distinguished from a special act. Applying the correct standard of review, the "conditions" imposed on the Lakepointe development parcel in this case do not constitute "zoning" in any constitutional sense but are mere governmental restrictions custom-drafted to limit appellant's use of its land and should be disapproved as violating property rights guaranteed by the state and federal constitutions.
NOTES
[1] U.S. Const.Amend. V and XIV; Art. 1, § 2, Fla. Const.
[2] The conditions previously established for the southern portion's P.U.D. were incorporated into the master plan for Lakepointe. These conditions included residential-type office buildings, office space less than 10,000 square feet per acre, and building heights limited to 35 feet. They are not challenged in this case. Battaglia's D.R.I. application for Lakepointe proposed freestanding commercial use and taller buildings (up to 55 feet in height) only for the northern portion of the project.
[3] We find without merit Battaglia's additional argument that the term "residential scale and character" is undefined and vests unbridled discretion in Orange County officials to determine whether a particular design is acceptable. Battaglia itself used this design term in seeking community and county approval for the rezoning of the southern portion of Lakepointe. One of Battaglia's experts testified that "residential scale and character" had certain distinguishing characteristics which would make it similar to and compatible with the surrounding single family neighborhood.
[4] §§ 163.3184, 163.3194, Fla. Stat. (1991); Gardens Country Club Inc. v. Palm Beach County, 590 So.2d 488 (Fla. 4th DCA 1991); Battaglia Fruit Co. v. City of Maitland, 530 So.2d 940, 950 (Fla. 5th DCA 1988) (Sharp, W., C.J., dissenting).
[5] In Snyder, this court said: "The nature of the challenge, in this case, is not to the validity or constitutionality of the underlying comprehensive plan, or to the zoning legislation enacting that plan, but to the validity of the action denying the requested rezoning of one parcel of real property." 595 So.2d at 79.
[6] Snyder, 595 So.2d at 78.
[7] Snyder, 595 So.2d at 78.
[8] Activity centers are defined in the Future Land Use Section of the Orange County Growth Management Policy VI-32.
[9] The Orange County Comprehensive Plan was initially adopted in 1980. The Future Land Use Policy Guide Map was adopted as part of the Growth Management Policy Ordinance in 1985. The application for DRI approval was submitted in March 1986. The Future Land Use Map is a vital element of the County's Growth Management Plan. Battaglia Fruit Co. v. City of Maitland, 530 So.2d 940, 950 (Fla. 5th DCA 1988) (Sharp, W., C.J., dissenting).
[10] At the time of the DRI review, there was no formal joint agreement between Maitland and Orange County. Maitland and Orange County later entered into a formal agreement in July 1989.
[11] It has never been the law that a landowner is entitled to the highest and best use of his land. See Penn Central Tramp Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); Graham v. Estuary Properties, Inc., 399 So.2d 1374 (Fla.), cert. denied, 454 U.S. 1083, 102 S.Ct. 640, 70 L.Ed.2d 618 (1981); Glisson v. Alachua County, 558 So.2d 1030 (Fla. 1st DCA), rev. denied, 570 So.2d 1304 (Fla. 1990); Fox v. Treasure Coast Regional Planning Council, 442 So.2d 221 (Fla. 1st DCA 1983).