This is an appeal from a judgment for defendant, Kafko Manufacturing Company, notwithstanding the verdict for plaintiffs, Lloyd and Linda Strickland, on their conversion claim, and from a directed verdict for Kafko on the Stricklands' claim for violation of the Deceptive Trade Practices Act, Code 1975, § 8-19-1, et seq.
Lloyd Strickland attempted to purchase a swimming pool kit from Morgan Son Pool Company, which was allegedly a partnership between John R. Morgan, Sr., and John R. (Roger) Morgan, Jr. Strickland, a brick mason, was familiar with pool installations by Morgan Son, having done masonry work for the partnership. On July 29, 1983, Strickland obtained a cashier's *Page 715 
check in the amount of $4,228.44, payable to Kafko, and including the words, "for Pool Kit to be delivered to Rt. 1, Box 225, Enterprise, Alabama." Strickland testified that several checks Morgan Son had given him in payment for masonry work had not cleared Morgan Son's account on first presentment. His testimony continued:
 "Q. So you knew at that point, from that, you knew there were some problems with his [Roger Morgan's] cash flow, didn't you?
"A. Yes, sir.
 "Q. And is that why you had this check here made out to Kafko Manufacturing because you wanted to make sure that your pool got paid for?
 "A. Well, that is one of the reasons. I wanted to make sure who it was ordered from."
Strickland had not had any communication with Kafko, but had only been told by Roger Morgan that his pool would be purchased from Kafko. He gave the check to Roger Morgan, who said he would take it directly to Kafko's office near Atlanta, Georgia, so the pool could be delivered sooner. Although Strickland had discussed the pool with Roger Morgan and apparently had an oral agreement as to the type of pool he wanted, there was no written contract.
On or about August 7, 1983, Roger Morgan took the check to Kafko's office in Georgia and gave it to a secretary, who referred him to Jan DeRegt, the general manager. DeRegt testified that Morgan Son had last purchased pool kits from Kafko in June 1982 but still owed $1007.60 on that purchase. He testified that he had been trying to collect this amount, but Roger Morgan had told him that Morgan Son had not been paid for one of the pools and would not be able to pay Kafko until their customer paid them. DeRegt continued,
 "So a week before he dropped this check off into our office he called me and said he had finally settled the account that he was waiting for, he now had the money to pay me off, but due to the fact that the customer knew that he still owed me money on the particular pool they made the check out to Kafko Manufacturing, and would it be possible to bring the check to my office and to receive the difference that was left over after the account was cleared. I told him that was okay with me as long as it was certified funds. When he dropped in the office the check went to my bookkeeper, I asked her to check it, she said it was a certified check, nothing wrong with the cashier's check, and at that time I proceeded to write Mr. Morgan and Son a check back for $3200, the difference between the check he delivered [and] what he owed me."
The Stricklands presented nothing to dispute this account of the delivery and negotiation of the check.
When Strickland asked Roger Morgan where his pool was, Morgan responded that it had been ordered and gave excuses for delays. In early September 1983 Strickland went to his bank and learned that the cashier's check had been cashed. From the endorsement he obtained Kafko's address and thereby its telephone number. He called and spoke to DeRegt, who initially professed not to know about a pool for the Stricklands. When Strickland mentioned that he had given the cashier's check to Morgan, DeRegt responded, according to Strickland's testimony, "that he had received a check from Roger on payment for some money that Roger had owed him." Strickland demanded delivery of the pool, but apparently did not ask for a return of the proceeds of the check.
Strickland testified that DeRegt said he would talk to Morgan and asked him (Strickland) not to communicate with Morgan. DeRegt said he asked Strickland to send him a current telephone number for Morgan. In any event, the two had no further communication, other than Strickland's sending a copy of the cancelled check. Strickland consulted an attorney and this suit was filed. The complaint also named Morgan Son as a defendant, but Roger Morgan declared bankruptcy. The case proceeded to trial against John R. Morgan, Sr., but he denied being a partner *Page 716 
or principal in Morgan Son Pool Company. The trial court directed a verdict in his favor and the Stricklands do not appeal from that portion of the judgment.
The complaint as amended contained a count for breach of contract, a count for conversion, and a count for violation of the Deceptive Trade Practices Act. Kafko filed a counterclaim for $25,000, alleging abuse of process, but dismissed the counterclaim before trial commenced. The trial court granted directed verdicts on the breach of contract and Deceptive Trade Practices counts and submitted the conversion count to the jury, which returned a verdict against Kafko for $25,000. Upon Kafko's motion, the trial court granted a judgment notwithstanding the verdict. The Stricklands do not argue that the directed verdict on the contract count was improper.
Because the alleged conversion was of a check, which is ordinarily a negotiable instrument, we look first to the Alabama enactment of the Uniform Commercial Code. Code 1975, § 7-3-419, states in pertinent part: "(1) An instrument is converted when: . . . (b) Any person to whom it is delivered for payment refuses on demand either to pay or to return it." Kafko did not convert the check within the meaning of this statute because, as the word is used in the U.C.C., "payment" is made only by a promisor on a note or a drawee on a draft. See generally Articles 3 and 4; 6 R. Anderson, UniformCommercial Code, § 3-419:5 (3d ed. 1984); and R. Braucher and R. Riegert, Introduction to Commercial Transactions, ch. II-2 (1977). Kafko merely negotiated or cashed the check, see §7-3-202, so its handling of the check does not come within the terms of § 7-3-419. Even if § 7-3-419 may apply in some circumstances to one to whom an instrument is transferred for negotiation, Kafko did not convert the check within the meaning of this statute because it gave full value for it.
A negotiable instrument may be subject to conversion outside the provisions of § 7-3-419. Cf. Citibanc of Alabama/Fultondalev. Tricor Energies, Inc., 493 So.2d 1344 (Ala. 1986); 1 R. Anderson, op. cit., § 1-103:25 (1981). A common law action for conversion will lie for (1) a wrongful taking, (2) an illegal assumption of ownership, (3) an illegal use or misuse, or (4) a wrongful detention. Raley v. Royal Ins. Co., 386 So.2d 742
(Ala. 1980); Ott v. Fox, 362 So.2d 836 (Ala. 1978).
The question of whether Kafko acted wrongfully or illegally in taking, assuming ownership of, or using the check will turn on the question of whether the check was a negotiable instrument. A check is a negotiable instrument if it is signed by the maker or drawer, contains "an unconditional promise or order to pay a sum certain," is payable on demand or at a definite time, and is payable to order or to bearer. Code 1975, § 7-3-104. This check was signed by the maker (the bank), and was payable to order of Kafko. It is not argued that the language "for pool to be delivered" prevents the check from being payable on demand; if that language has any effect on negotiability, it is to make the promise conditional upon those terms.
Code 1975, § 7-3-105, provides in pertinent part:
 "(1) A promise or order otherwise unconditional is not made conditional by the fact that the instrument:
". . .
 "(b) States its consideration, whether performed or promised, or the transaction which gave rise to the instrument, or that the promise or order is made or the instrument matures in accordance with or 'as per' such transaction."
(Emphasis added.) This Code provision prevents the language printed on the cashier's check, "for pool to be delivered," from conditioning the promise to pay upon the delivery of a pool kit. Delivery of the pool was the consideration for the check, or the transaction which gave rise to it, and the statute explicitly provides that payment of the check is not conditioned upon performance of the stated consideration. Thus, Kafko was not bound to inquire of its dealer whether he had delivered the pool purchased with the money represented by the *Page 717 
check. See generally 5 R. Anderson, Uniform Commercial Code, § 3-105:4 et seq. (3d ed. 1984).
That such is the appropriate interpretation of the language is illustrated by the manner in which the check would be handled after it was cashed by Kafko. Kafko's bank would be fully justified in taking the check for deposit, and the Stricklands' bank would be fully justified in paying Kafko's bank, without any inquiry into whether the pool had been delivered.
The Court of Civil Appeals has decided two cases closely on point since the enactment of the Uniform Commercial Code. InHolsonback v. First State Bank of Albertville, 394 So.2d 381
(Ala.Civ.App. 1980), cert. denied, 394 So.2d 384 (Ala. 1981), the Court of Civil Appeals held that language on the face of a note or draft did not make the promise or order to pay a conditional one, citing § 7-3-105(1)(a), which regards implied or constructive conditions.
In contrast, the same court held in Participating PartsAssociates, Inc. v. Pylant, 460 So.2d 1299, 1301
(Ala.Civ.App. 1984), that the trial court was "authorized to consider evidence other than the check in determining whether the check was an unconditional [order] to pay a certain sum of money," because the payee plaintiff had not objected to the drawer defendant's testimony "concerning the circumstances under which the check was issued." Thus, that case is distinguishable as turning on a failure to object, which amounted to a waiver of a defense to the claim of conditionality. Furthermore,Participating Parts involved a dispute between the immediate parties to the check, and the Court of Civil Appeals considered the payee as a holder not having the rights of a holder in due course, citing § 7-3-306. That analysis fits the facts of that case because the payee took the check with notice of the drawer's claim and arguably attempted to cash it not in good faith; furthermore, the evidence indicated that the payee did not take the check for value. A parallel situation in the instant case would exist if Strickland had made the check out to Morgan Son and Roger Morgan had attempted to cash it. Although Kafko was the payee, Morgan served as an intermediary and his misrepresentations prevent Kafko from having notice of Strickland's claim or defense.
A holder in due course takes a negotiable instrument free from all claims and defenses, with exceptions not pertinent here. Code 1975, § 7-3-305. Section 7-3-302 defines "holder in due course":
 "(1) A holder in due course is a holder who takes the instrument:
"(a) For value; and
"(b) In good faith; and
 "(c) Without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.
"(2) A payee may be a holder in due course."
Because § 7-3-105 answers the question of notice of a claim to the check, and because Kafko gave full value for the check, the only question is whether Kafko took it in good faith. There was no evidence of any actual knowledge on Kafko's part that the Stricklands' pool had not been delivered. Neither is there any evidence of constructive knowledge that would justify a finding of lack of good faith. The invoices for the pools Kafko sold to Morgan Son in June 1982 did not give the names of the customers to whom Morgan Son was selling the pools, so there is no indication in the record that DeRegt had any way of verifying or disproving Roger Morgan's explanation of the check.
Therefore, Kafko did not wrongfully take the check, illegally assume ownership of it, or illegally use or misuse it. The Stricklands appear to argue that Kafko illegally retained the money which was the proceeds of the check but, aside from the facts that Kafko paid part of the proceeds to Roger Morgan and that an action in conversion will not lie for unidentified money, see Lewis v. Fowler, 479 So.2d 725 (Ala. 1985), Strickland never demanded return of the money.
For the foregoing reasons, the trial court did not err in holding that the Stricklands did not prove a conversion. *Page 718 
Neither can the Stricklands prevail on their Deceptive Trade Practices count. Section 8-19-5 sets forth a list of activities that it declares to be unlawful. The Stricklands cite subsection (17), which makes it unlawful to fail to ship goods after receipt of payment for them, and subsection (22), which makes it unlawful to engage "in any other unconscionable, false, misleading or deceptive act or practice in the conduct of trade or commerce." Kafko cites § 8-19-13, however, which provides a defense to actions brought under the Deceptive Trade Practices Act:
 "Any person against whom any civil action or proceeding is brought pursuant to this chapter shall have a defense to such action or proceeding upon a showing by a preponderance of the evidence presented that such person did not knowingly commit any act or knowingly engage in any activity which constitutes a violation of any provision of this chapter."
Not only was there no evidence that Kafko knew it was failing to ship goods for which it had been paid, but the evidence does not even support a finding that Kafko was paid for a pool. Therefore, subsection (17) does not support a holding that the trial court erred in granting a directed verdict on this count. The Stricklands argue that DeRegt's failure to ship the pool after he was notified of the true situation constituted a knowing violation at least of subsection (22), but the evidence indicates at most that both Strickland and Kafko were defrauded by Roger Morgan. The trial court did not err in granting Kafko a directed verdict on the Deceptive Trade Practices count.
For the foregoing reasons, the judgment is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, SHORES, ADAMS and HOUSTON, JJ., concur.
JONES, and BEATTY, JJ., dissent in part but concur in the result, with opinion by BEATTY, J.