825 So.2d 786 (2002)
AMERICAN LIBERTY INSURANCE COMPANY
v.
AmSOUTH BANK.
1001641.
Supreme Court of Alabama.
January 18, 2002.
*788 Thomas L. Selden and Elise Frohsin of Starnes & Atchison, Birmingham, for appellant.
Henry E. Simpson and Robert D. Eckinger of Lange, Simpson, Robinson & Somerville, L.L.P., Birmingham; and William H. Hardie of Johnstone, Adams, Bailey, Gordon & Harris, L.L.C., Mobile, for appellee.
HOUSTON, Justice.
This case involves the right of a surety of an estate to sue to recover funds from a bank that paid a check made out to the estate and endorsed by the person who was appointed conservator of the estate before that person's appointment as conservator. American Liberty Insurance Company ("ALIC"), as surety for the conservator of the estate of Mathe Bernard Sumrall, appeals the Mobile Circuit Court's summary judgment in favor of AmSouth Bank, and the trial court's denial of ALIC's motion for a summary judgment, as to ALIC's claims of conversion against AmSouth. We affirm.
The seeds of this case were planted in January 1994, when Mathe Sumrall received a settlement for injuries that he had sustained in an automobile accident. Out of concern for Sumrall's ability to handle his finances, Sumrall's attorneys filed a motion in the Mobile Circuit Court asking the court to approve the settlement and to appoint Thomas E. Bryant, Jr., as guardian ad litem. The motion also represented that an application seeking to have a permanent guardianship established would be made to the Mobile County Probate Court after the settlement was approved. On January 26, 1994, the court granted the motion.
On February 2, 1994, Bryant, as General Guardian and Conservator of Mobile County, filed a petition for letters of conservatorship on behalf of Sumrall. On that same day, the probate court set Bryant's petition for a hearing, which was to take place in March, and appointed Cheryl Eubanks, a local attorney, as Sumrall's guardian ad litem.
On February 7, 1994, Sumrall's attorneys issued a check, drawn on their attorney trust account at AmSouth, in the amount of $378,546.09, representing the net proceeds of Sumrall's settlement. The check was made payable to "The Estate of Mathe Sumrall." On the same day, while Bryant's petition for letters of conservatorship was pending, Sumrall's attorneys delivered the check to Bryant. Bryant indorsed the check with his own name and trust-account number and then deposited it into his attorney trust account at Regions Bank.[1] The check was eventually *789 presented to AmSouth, and, on February 11, 1994, AmSouth paid the check.
On June 20, 1994, the court granted Bryant's petition for letters of conservatorship, contingent upon the filing of a bond in the amount of $415,000. At Bryant's request, ALIC issued a bond in the required amount on Bryant's behalf as conservator of the Sumrall estate. Accordingly, on July 15, 1994, the probate court issued letters of conservatorship to Bryant.
On August 25, 1994, Bryant, as conservator of the Sumrall estate, filed an inventory with the probate court acknowledging receipt of the proceeds of the check paid by AmSouth. Bryant also maintained a ledger showing the balance held for Sumrall's benefit. Between July 1994 and May 1995, Bryant disbursed $28,505.97 from his attorney trust account for Sumrall's benefit.
In June 1995, it was discovered that Bryant had misappropriated the Sumrall estate funds. On June 8, 1995, the probate court removed Bryant as conservator and ordered ALIC, as surety for Bryant, to file a settlement with regard to the Sumrall estate. ALIC complied with the order, and, on July 11, 1996, the probate court entered a judgment finding ALIC, as surety, liable to the Sumrall estate in the amount of $405,024.80, for funds misappropriated by Bryant. This amount included the $378,546.09 from the check paid by AmSouth. ALIC subsequently paid into the probate court $405,024.80, plus $323 in court costs.
On March 26, 1997, ALIC filed a motion in the probate court seeking relief from the judgment. In the motion ALIC asserted that it was entitled to a refund of the amounts paid under the judgment because the Sumrall estate funds were misappropriated before Bryant became the conservator. The probate court denied ALIC's motion on April 7, 1997.
In August 1997, ALIC filed an action in the United States District Court for the Southern District of Alabama, seeking a refund, on unjust-enrichment grounds, of the amounts it had paid in the probate court. ALIC also sought a judgment from the court declaring that it was not liable to the estate with respect to any losses incurred before Bryant's appointment as conservator. The federal district court entered a summary judgment against ALIC, holding that the order of the probate court barred ALIC's federal action under the principles of res judicata.
On December 15, 1998, ALIC filed the present action in the Jefferson Circuit Court, naming AmSouth as a defendant.[2] ALIC alleged that it was subrogated to, and was the equitable assignee of, all rights and claims of the Sumrall estate by virtue of ALIC's payment as surety for Bryant, as the conservator of the estate. ALIC further alleged that Bryant had no authority to indorse the check and therefore that AmSouth's payment of the check was wrongful and constituted a conversion of the funds of the Sumrall estate.
On July 2, 1999, AmSouth filed a motion to transfer the case to the Mobile Circuit Court on forum non conveniens grounds, representing that discovery would be needed from many important witnesses who reside in Mobile County. On July 13, 1999, ALIC filed a motion for a summary judgment. However, the trial judge did not rule on ALIC's motion and instead granted AmSouth's motion to transfer the *790 case to Mobile County on September 28, 1999.
On October 29, 1999, AmSouth filed in the Mobile Circuit Court a cross-motion for a summary judgment. On May 8, 2001, the trial court granted AmSouth's motion for a summary judgment, denied ALIC's motion, and dismissed the case with prejudice. ALIC appeals both the summary judgment in favor of AmSouth, and the denial of ALIC's motion for a summary judgment.
We review this case de novo, applying the oft-stated principles governing appellate review of a trial court's grant or denial of a summary-judgment motion:
"We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. `Substantial evidence' is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw."
Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C., 792 So.2d 369, 372 (Ala. 2001) (citations omitted).
ALIC contends that AmSouth was not entitled to a summary judgment because, ALIC argues, the Sumrall estate would have a valid claim against AmSouth for conversion and ALIC, by virtue of its subrogation rights, can pursue that claim. Because it appears that the material facts are not in dispute, we examine whether AmSouth was entitled to a judgment as a matter of law.

A. Subrogation
There is no doubt that ALIC is subrogated to all of the rights and remedies of the Sumrall estate, so that ALIC may pursue an action against Bryant to recover the amounts paid by ALIC as a result of Bryant's misappropriation. Ala. Code 1975, §§ 8-3-2 & 8-3-11; see Firemen's Ins. Co. v. Pugh, 686 So.2d 281, 284 (Ala.Civ.App.1996) (noting that a surety forced to pay on a bond, after funds being held for an incapacitated person were misappropriated, had a right of subrogation under § 8-3-2). The initial question before us is whether ALIC may pursue an action against AmSouth.
AmSouth contends that ALIC's right to pursue claims based on subrogation is generally limited to claims that might be brought against Bryant, and that in order to be subrogated so that it might bring a claim against AmSouth, ALIC would have to demonstrate that it has "superior equities" than AmSouth. We disagree.
Alabama has long recognized that a surety who pays the debt of his principal "stands in the shoes" of the payee and may enforce the payee's rights in order to seek reimbursement. See Lloyd Wood Constr. Co. v. Con-Serv, Inc., 285 Ala. 409, 414, 232 So.2d 649, 654 (1970) ("As to subrogation rights, a surety ... takes the position of the creditor who has been satisfied by the surety."). This policy is currently reflected in Ala.Code 1975, §§ 8-3-2 and 8-3-11, which provide:
"A surety who has paid his principal's debt is entitled to a transfer of the original and collateral security which the creditor holds; he has all the rights to realize thereon and to reimburse himself to the same extent as the creditor *791 might have done before the surety paid him, whether paid before or after judgment; and he shall be substituted for the creditor and subrogated to all his rights and remedies; in effect, he shall be a purchaser of the debt and all its incidents.

Ala.Code 1975, § 8-3-2 (emphasis added).

"A surety who has paid the debt of his principal is subrogated to all the rights of the creditor and, in a controversy with other creditors, ranks in dignity the same as the creditor whose claim is paid."
Ala.Code 1975, § 8-3-11 (emphasis added).
These statutes are broadly written; they transfer to a surety all of the rights and remedies of the creditor that are even incidentally related to the underlying debt. In other words, if a creditor had a right or remedy that is in some concrete way related to the transactions surrounding the underlying debt, which the creditor might have pursued in order to seek reimbursement of indebted funds that are not recovered, a surety that pays the underlying debt would be allowed to pursue that right or remedy in order to seek reimbursement.
It is true that some jurisdictions require, in addition to the mere payment of the debt of another, a party's demonstration of "superior equities" when that party is seeking subrogation against a third party who is not the primary wrongdoer. See National Union Fire Ins. Co. v. Riggs Nat'l Bank, 646 A.2d 966, 968-72 (D.C.1994) (discussing the "superior-equities doctrine" and various jurisdictions' application or rejection of it). However, the "superior-equities doctrine" has never been specifically adopted in Alabama. In fact, under situations factually similar to this case, Alabama state courts and federal courts construing Alabama law have, as AmSouth admits, accepted the right of subrogation without challenge or mention of "superior equities." See Bank of Guntersville v. United States Fid. & Guar. Co., 201 Ala. 19, 75 So. 168 (1917); National Sur. Corp. v. Cherokee County Bank, 57 F.Supp. 370 (N.D.Ala.1944); see also American Bonding Co. v. Fourth Nat'l Bank, 205 Ala. 652, 88 So. 838 (1921)(holding that a surety was subrogated to state a claim against a bank that had participated in a guardian's misappropriation of funds).
Furthermore, the viability of the superior-equities doctrine, especially in the context of modern banking practices,[3] is *792 questionable. In National Union Fire Insurance Co. v. Riggs National Bank, supra, the District of Columbia Court of Appeals held that an insurer, who had paid for losses incurred by its insured stemming from fraudulent checks drawn on the insured's bank account, did not have to demonstrate "superior equities" in order to be subrogated so as to bring an action against the bank for wrongfully processing the checks. The National Union court held that the superior-equities doctrine did not apply to claims based on "conventional subrogation" (i.e., those based upon a contractual right to subrogation). The court based its opinion primarily upon the premise that if the bank would be liable to the insured, there would be no prejudice to the bank in allowing the insurer to bring the claim:
"We ... are persuaded to follow the line of cases holding that the superior equities doctrine, although applicable to equitable subrogation claims, has no application in cases of conventional subrogation and assignment. Conventional subrogation and assignment are based on contractual agreements between parties and do not derive their validity from principles of equity. Where the bank would be liable to the depositor and the depositor agrees to assign or contract its rights to its insurer, we see no sound reason for allowing the bank to prevail against the insurer. Enforcing the agreement does not saddle the bank with any new or unexpected liability. Further, it will carry out the intent of the insurance contract, under which the insurer has effectively agreed to assume ultimate liability only where the law otherwise would place that liability upon the insured. Because the assignee stands in the same position as the assignor, the bank's liability with or without the assignment will depend upon its duty to the depositor. Under this principle, the insurer as successor to the depositor's rights should not be subject to the superior equities doctrine which the bank could not have raised to defeat a suit by the depositor. Relevant here, the UCC has spelled out in detail and resolved conflicting views as to the circumstances under which a depository bank should be held liable to its depositor in cases of forgeries.... The relative certainty thus provided should not be discarded for an amorphous balancing of equities where, by express agreement, an insurer stands squarely in the depositor's shoes."
National Union, 646 A.2d at 971-72 (footnotes and citations omitted; emphasis added).
Alabama law does recognize the technical distinction between "legal" (or "equitable") subrogation and conventional subrogation. See International Underwriters/Brokers Inc., v. Liao, 548 So.2d 163, 165 (Ala.1989). However, we fail to find in this distinction a significance sufficient to justify requiring one seeking legal subrogation (such as ALIC) to prove the additional element of superior equities. We generally agree with the rationale of National Union, but we see no reason to limit its applicability strictly to conventional subrogation. Prejudice to third-party wrongdoers is not determined by the existence of a subrogation agreement between two other parties. For example, in the context of this case, if the Sumrall estate had a viable claim of conversion against AmSouth, then Am-South suffers no prejudice if the same claim is pursued by ALIC instead of by the Sumrall estate.
Applying the above principles to the case at hand, we find that the alleged conversion of the check by AmSouth is certainly related to the underlying debt; indeed, it was through this check that the *793 misappropriated funds came to be available to Bryant in the first place. Therefore, we hold that ALIC is subrogated to all of the rights and remedies of the Sumrall estate against not only Bryant, but also against AmSouth for conversion of the check. AmSouth argues, however, that even if ALIC were subrogated so as to be able to bring a cause of action for conversion against AmSouth, the summary judgment in AmSouth's favor was nonetheless properly entered. We agree.

B. Conversion
ALIC argues that it can maintain actions against AmSouth for conversion under former Ala.Code 1975, § 7-3-419(1)(c)[4] (a part of Alabama's version of the UCC) and under the common law. AmSouth contends that it is entitled to a judgment as a matter of law as to both of these causes of action. We examine each cause of action in turn.

1. Conversion under former § 7-3-419(1)(c)
ALIC alleges that Bryant had no authority to indorse the check and therefore that AmSouth's payment of the check was wrongful and constituted a conversion of funds of the Sumrall estate. Before its amendment in 1995, Alabama's version of the UCC provided that a bank would be liable for conversion under the following circumstances:
"(1) An instrument is converted when:
"(a) A drawee to whom it is delivered for acceptance refuses to return it on demand; or
"(b) Any person to whom it is delivered for payment refuses on demand either to pay or to return it; or
"(c) It is paid on a forged indorsement."

Ala.Code 1975, § 7-3-419 (pre-1995 amendment, emphasis added).
ALIC contends that the term "forged," as it was used in the former 7-3-419(1)(c), includes "unauthorized." As support for this contention, ALIC cites Ala.Code 1975, § 7-1-201(43), which provides that an "`unauthorized' signature or indorsement means one made without actual, implied or apparent authority and includes a forgery." However, this Code section clearly characterizes "a forgery" as an included, but narrower, subset of "unauthorized" indorsements; it does not equate the two terms. According to this definition, all forged indorsements are unauthorized, but not all unauthorized indorsements are necessarily forged.
It appears that despite this rather clear distinction, some jurisdictions have considered the two terms"forged" and "unauthorized" as interchangeable. See, e.g., Equipment Distribs., Inc. v. Charter Oak Bank & Trust Co., 34 Conn.Supp. 606, 611, 379 A.2d 682, 684 (1977) (stating that, under the UCC, "an unauthorized endorsement and a forged endorsement are one and the same"); Salsman v. National Community Bank, 102 N.J.Super. 482, 492-93, 246 A.2d 162, 167-68 (1968) (stating that "[t]he use of the word `forged indorsement' as constituting a conversion... does not preclude the finding of conversion where the unauthorized signature does not constitute a forgery in the strict sense" and noting that "[i]f the [UCC] fails expressly to include unauthorized indorsements other than forgeries in [its] conversion section, the law may reach the same result by implication"); Barbara Singer, Uniform Commercial Code Section 3-419 and the Battle to Preserve a Payee's Right *794 to Sue Directly a Depository or Collecting Bank That Pays on a Forged Indorsement, 15 Seton Hall Legis. J. 39, 74-75 nn. 192 & 197 (1991) (citing both Equipment Distributors and Salsman, and noting that "[g]iven their apparent preference for the broader term `unauthorized,' one wonders why the Code drafters chose, without explanation, to use the narrower term `forged' in section 3-419(1)(c). In any event, ... when construing section 3-419, the courts have generally treated `forged' and `unauthorized' as interchangeable terms."). In fact, according to one source, "[i]n apparently no reported case has a claim been successfully asserted that an indorsement which was unauthorized was not a `forged indorsement' within the meaning of UCC § 3-419(1)(c)." Michael A. Rosenhouse, Annotation, Payee's Right of Recovery, in Conversion under UCC § 3-419(1)(c), for Money Paid on Unauthorized Indorsement, 23 A.L.R.4th 855, 858 n. 8 (1983).
Our task, however, is to resist "finding" meanings in statutes when those meanings would contravene the very wording of the statutes themselves. "Treating" the terms "unauthorized" and "forged" as having the same meaning under the Alabama UCC would represent such a contravention. Not only is it apparent that, under the Alabama UCC, "forged indorsements" is a narrower subset of "unauthorized indorsements," it is also apparent that the drafters of the UCCand by extension, the Alabama Legislature, which adopted and enacted itunderstood how to use the broader term "unauthorized" and yet chose to limit conversion of an instrument under the former § 7-3-419(1)(c) to payment on a forged indorsement.
This understanding of former § 7-3-419(1)(c) might not be the majority view. It is, however, in accordance with the statutory language, and it is therefore also in accordance with all of the legislative power this Court is allowed to wield under the Alabama Constitution. See Ala. Const. 1901 § 43 ("the judicial [branch] shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men") (emphasis added).
In light of the above, we hold that ALIC cannot maintain its conversion claim under former § 7-3-419(1)(c). ALIC's claim under that statute is based solely upon Bryant's alleged lack of authorization. However, even if Bryant was not authorized to indorse the check, he did not forge the indorsement; rather, he indorsed the check with his own name and trust-account number. Therefore, summary judgment in favor of AmSouth was properly entered as to ALIC's claim under former § 7-3-419(1)(c).

2. Common-law conversion
ALIC argues that, even if it could not assert a claim under former § 7-3-419(1)(c), it can maintain a claim for common-law conversion. We disagree.
Ala.Code 1975, § 7-1-103 provides that "the principles of law and equity" shall supplement Alabama's UCC "[u]nless displaced by the particular provisions of [the Alabama UCC]." AmSouth argues that ALIC's conversion claim is limited to the former § 7-3-419(1)(c) because this provision has "displaced" ALIC's purported cause of action for common-law conversion.
Whether a statutory provision has "displaced" a common-law cause of action under § 7-1-103 will depend to a great degree on (1) the levels of identity between, and specificity of, both the common-law cause of action being asserted and the statutory provision, and (2) the extent to which the statutory language evidences *795 that the provision's scope of operation affirmatively excludes a necessary basis of the common-law cause of action. See generally C & N Contractors, Inc. v. Community Bancshares, Inc., 646 So.2d 1357, 1361-63 (Ala.1994) (discussing, without deciding, whether Ala.Code § 7-3-405(l) displaces certain common-law claims of negligence and wantonness). Under § 7-1-103, when a statute provides a cause of action relating to a specific factual situation in a specific manner, then any common-law cause of action based upon a factual situation so materially identical that it is clearly within the specific scope of the provision must be said to have been "displaced," especially if it is in some way affirmatively excluded by the statutory language.
As stated above, the Legislature pronounced in the former § 7-3-419(1)(c) that a party that pays an instrument on a forged indorsementaccording to the Legislature, mere proof of lack of authorization is not sufficientwill be liable for conversion. Therefore, any common-law claim (stemming from the time that the former § 7-3-419(1)(c) was in force) that a payor has converted an instrument based solely on the propriety of the indorsement was displaced by, and is now governed by, the former § 7-3-419(1)(c).
In support of its position that the former § 7-3-419(1)(c) did not "displace" its action for common-law conversion, ALIC relies upon Strickland v. Kafko Manufacturing, Inc., 512 So.2d 714 (Ala.1987). However, the holding in Strickland does not save ALIC's common-law conversion claim.
In Strickland, the plaintiff delivered a cashier's check to a swimming pool dealer with the understanding that the dealer would obtain for the plaintiff a swimming pool kit from a kit manufacturer. 512 So.2d at 714-15. However, after the dealer delivered the check to the manufacturer, the manufacturer (apparently following a misrepresentation by the dealer) applied part of the funds to a previous debt owed by the dealer, returned the remaining funds to the dealer, and never delivered the pool kit to the plaintiff. Id. at 715. The plaintiff sued the manufacturer for, among other things, conversion of the check. Following a jury verdict in favor of the plaintiff, the trial court entered a judgment notwithstanding the verdict. Id. at 715-16.
In affirming, this Court held that the plaintiff could not maintain a claim for conversion under the former § 7-3-419(1)(b):
"Because the alleged conversion was of a check, which is ordinarily a negotiable instrument, we look first to the Alabama enactment of the Uniform Commercial Code. Code 1975, § 7-3-419, states in pertinent part: `(1) An instrument is converted when: ... (b) Any person to whom it is delivered for payment refuses on demand either to pay or to return it.' Kafko did not convert the check within the meaning of this statute because, as the word is used in the U.C.C., `payment' is made only by a promisor on a note or a drawee on a draft. Kafko merely negotiated or cashed the check, see § 7-3-202, so its handling of the check does not come within the terms of § 7-3-419. Even if § 7-3-419 may apply in some circumstances to one to whom an instrument is transferred for negotiation, Kafko did not convert the check within the meaning of this statute because it gave full value for it."
Strickland, 512 So.2d at 716 (citations omitted). We then stated that "[a] negotiable instrument may be subject to conversion outside the provisions of § 7-3-419," and analyzed the plaintiff's claim under the elements of common-law conversion. Id. (citing Citibanc of Alabama/Fultondale *796 v. Tricor Energies, Inc., 493 So.2d 1344 (Ala.1986)).
However, this statement does not mean that the provisions in the former § 7-3-419 never displace common-law causes of action for conversion of instruments; rather, Strickland stands for the logical proposition that some common-law causes of action for conversion of instruments "may" exist outside of the statute. As stated above, the question is one of identity, specificity, and exclusivity: does the statutory provision provide a cause of action based on a specific situation in such a specific way that creates a (perhaps exclusive) scope of operation sufficiently narrow so as to displace or affirmatively preclude a common-law cause of action based upon a materially identical situation within that scope? The Court did not address the issue of displacement in Strickland, possibly because the specific factual situation covered by the scope of operation of the former § 7-3-419(1)(b) (based upon delivery of an instrument for payment) was very different from the factual basis for the common law cause of action being asserted (based upon the fact that the check, as consideration for the pool kit, had been wrongfully used).[5] Furthermore, there was no indication that any statutory language affirmatively excluded a necessary basis of the cause of action.
By way of contrast, the specific factual basis for ALIC's asserted common-law conversion claim (based solely upon payment of an instrument and the propriety of its indorsement) is well within the specific scope of operation of the former § 7-3-419(1)(c) (based solely upon payment of an instrument and the propriety of its indorsement). Additionally, the sole factual distinction between ALIC's common-law claim and the former § 7-3-419(1)(c) "unauthorized indorsement" rather than "forged indorsement"does not represent a conflict between two completely different concepts; rather, one"forged"is but a narrower subset of the other"unauthorized." Furthermore, it is especially important to the issue of exclusivity that the two concepts were understood by the Legislature to be related in this way, and yet the Legislature chose the narrower of the two in enacting the former § 7-3-419(1)(c).
In light of the above, we hold that the former § 7-3-419(1)(c) displaced ALIC's common-law cause of action for conversion.
We hold that AmSouth was entitled to a judgment as a matter of law as to ALIC's claims of conversion under either the UCC or the common law.[6] Therefore, the trial court's summary judgment in favor of Am-South, as well as the court's denial of ALIC's motion for a summary judgment, was appropriate.
AFFIRMED.
SEE, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.
MOORE, C.J., and HARWOOD, J., concur in the result.
LYONS, J., concurs in part and concurs in the result in part.
LYONS, Justice (concurring in part and concurring in the result in part).
Assuming without deciding that American Liberty Insurance Company ("ALIC") *797 is entitled to be subrogated to all of the Mathe Bernard Sumrall estate's rights and remedies and that Thomas E. Bryant, Jr.'s unauthorized signature constituted a forged indorsement within the meaning of § 7-3-419, Ala.Code 1975 (as it read before the 1995 amendment), AmSouth Bank is not liable for conversion.
A common-law exception to a bank's liability for payment on a forged indorsement is when the money has reached the intended person. 9 C.J.S. Banks and Banking, § 418, at 394-95 (1996). While this principle of the common law has never been applied in Alabama, it has been recognized in many jurisdictions. See, e.g., Perini Corp. v. First Nat'l Bank of Habersham County, Georgia, 553 F.2d 398, rehearing denied, 557 F.2d 823 (5th Cir.1977); County Concrete Corp. v. Smith, 317 N.J.Super. 50, 57, 721 A.2d 34, 38 (1998) ("If the funds obtained by the forgery reach the intended payee, the maker has suffered no injury and is not entitled to recover from the bank which paid on the forged endorsement...."); Stella v. Dean Witter Reynolds, Inc., 241 N.J.Super. 55, 68, 574 A.2d 468, cert. denied, 122 N.J. 418, 585 A.2d 412 (1990); Fulka v. Florida Commercial Banks, Inc., 371 So.2d 521, 525 n. 7 (Fla. Dist.Ct.App.1979); Clemens v. First Nat'l Bank of Berryville, 286 Ark. 290, 294-95, 692 S.W.2d 222, 225 (1985); Jones v. American Bank & Trust Co., 387 So.2d 1360 (La.Ct.App.1980); Blomquist v. Zions First Nat'l Bank, N.A., 18 Utah 2d 65, 415 P.2d 213 (1966); Sundail Constr. Co. v. Liberty Bank of Buffalo, 277 N.Y. 137, 142, 13 N.E.2d 745, 747 (1938).
There is no question that Bryant, as conservator of the Sumrall estate, was the intended payee. The injury suffered by the Sumrall estate occurred as a result of Bryant's conduct as conservator rather than AmSouth's method of negotiating the check. The situation here is analogous to that presented in County Concrete Corp. v. Smith, supra, where the court, relying on a previous decision in which it affirmed a judgment entered in a case where the proceeds from checks cashed with forged indorsements nevertheless reached the intended party, observed:
"`In the present case, the funds paid on the forged endorsements were transmitted to Murray, where Sykes wanted them to go. He suffered no injury as the result of the Bank's action in paying on the forged endorsements. His injury was the result of his entrusting the funds to Murray and not the result of the manner in which they were transmitted.'"

317 N.J.Super. at 58, 721 A.2d at 38 (emphasis added), quoting Stella v. Dean Witter Reynolds, Inc., 241 N.J.Super. at 68, 574 A.2d at 475.
This common-law exception does not appear in Alabama's codification of the Uniform Commercial Code. However, § 7-1-103, Ala.Code 1975, an introductory provision to the Uniform Commercial Code, preserves supplementary general principles of law and equity ("Unless displaced by the particular provisions of this title, the principles of law and equity ... shall supplement its provisions."). In Starkey Constr., Inc. v. Elcon, Inc., 248 Ark. 958, 457 S.W.2d 509 (1970), the Arkansas Supreme Court dealt with this very issue of the availability under the Arkansas counterpart to § 7-3-419 of the receipt of the funds by the intended payee as an exception to a bank's liability for conversion based upon payment on a forged indorsement. The court, in holding that the exception applied, stated:
"We find no reference in the statute heretofore mentioned to the situation presented in the instant case, i.e., where the money actually reached the party intended by the drawer.
"Of course, as pointed out by appellees, in attempting to codify a large body of law it is almost impossible to anticipate all the factual situations that may arise. And it is for this reason that courts have adopted the principle of statutory construction that a statute will not be construed so as to overrule a *798 principle of established common law, unless it is made plain by the act that such a change in the established law is intended."
248 Ark. at 964-65, 457 S.W.2d at 513. Accord, Ambassador Fin. Servs., Inc. v. Indiana Nat'l Bank, 605 N.E.2d 746 (Ind. 1992). I can see no basis to withhold availability of the common-law exception; therefore, the receipt of the funds by Bryant, as conservator, is a complete defense to ALIC's claim, as subrogee of the estate, against AmSouth for conversion pursuant to § 7-3-419.
I concur in Part B.2. of the majority opinion, concluding that the remedy afforded by § 7-3-419 displaces a common-law remedy for the claim here presented.
NOTES
[1] The check was indorsed as follows:

"Prior endorsement and/or absence of endorsement of payee guaranteed by Thomas E. Bryant, Jr., and deposit only Thomas E. Bryant, Jr., Trustee Account."
(Footnote cont'd.)
The parties raise no issue as to the form of the indorsement.
[2] Regions was also named as a defendant, but the action against it was later voluntarily dismissed, without prejudice.
[3] As one authority has written, the application of the superior-equities doctrine to deny sureties the ability to assert claims against banks that, as alleged here, pay checks bearing forged indorsements, is an unwise policy that is perhaps out of line with modern banking practices under the Uniform Commercial Code:

"On balance then, the rule denying subrogation in these cases has outlived any usefulness that it may once have had, and it would be preferable to treat the fidelity insurer as a subsurety with a right to subrogation against the bank as principal surety. The `superior equity' doctrine is arbitrary in giving to an insured the choice of allocation of ultimate loss, and unjust in increasing the burden of the insured because of his foresightedness in insuring. It has never gained currency under forgery insurance policies, and with the adoption of the Uniform Commercial Code, the hard cases that contributed to its growth under fidelity bonds will be eliminated.
". . . .
"... As opportunities to spread the risk of forgery increase, and as more states adopt the Uniform Commercial Code, the popularity of the rule that throws the loss on the insurer by denying subrogation in the absence of a `superior equity' can be expected to wane."
E. Allan Farnsworth, Insurance Against Check Forgery, 60 Colum. L.Rev. 284, 324-25 (1960) (cited in National Union, supra).
[4] The parties agree that the pre-1995 version of the Alabama UCC is applicable to these facts. Currently, conversion of instruments under Alabama's UCC is found in Ala.Code 1975, § 7-3-420. See Act No. 95-668, Ala. Acts 1995.
[5] Additionally, the factual scenario in Strickland differs from that covered in the former § 7-3-419(1)(b) in that there is no indication that the plaintiff in Strickland asked for the return of the check. Instead, the plaintiff demanded only delivery of his pool kit. Strickland, 512 So.2d at 715.
[6] AmSouth also asserts that the Uniform Fiduciaries Act, Ala.Code 1975, § 19-1-1 et seq., applies to these facts and provides further protection to AmSouth. While it is doubtful that the Act applies to banks other than depositary banks, see §§ 19-1-4 and 19-1-9, we need not, and do not, reach this issue.