This appeal concerns the proper allocation, under Alabama's version of Articles 3 and 4 of the Uniform Commercial Code ("the UCC"), see Ala. Code 1975, § 7-3-101 et seq. and § 7-4-101 et seq., of losses resulting from a banking institution's acceptance of a insurer's draft made payable jointly to three payees without all the payees' endorsements.
In November 1998, a fire damaged the house of Thomas E. Burt, Jr., and Rhonda L. Burt. Title to the lot on which the house was located was encumbered by two mortgages, a first mortgage held by Nations-Banc Mortgage Corporation ("Nations-Banc") and a second mortgage held by Grace P. Clearman. On January 26, 1999, State Farm Fire and Casualty Company ("State Farm"), which had insured the house against fire losses, issued a draft in the amount of $49,460.73. State Farm's draft was made payable to the order of "THOMAS E. BURT RHONDA L. BURT NATIONSBANC MORTGAGE CORP. ITS SUCCESSORS AND/OR ASSIGNS ATIMA INSURANCE SERVICE CENTER," and also bore the legend "SOUTHTRUST BANK OF ALABAMA NA, BIRMINGHAM, AL." Concerning the relationship between State Farm and SouthTrust Bank of Alabama, NA ("South-Trust"), it is undisputed that SouthTrust, rather than being a "drawee" or "payor bank" with respect to the draft, was merely a "collecting bank" empowered to handle the draft for collection; in contrast, State Farm reserved to itself the power to approve or to refuse payment of its draft. See generally Ala. Code 1975, § 7-4-105 and §7-4-106(c).
On the same day that the draft was issued, Thomas Burt brought the draft to a teller at AOD Federal Credit Union ("AOD") and requested payment.[1] At the time that Thomas Burt requested payment, the draft bore the endorsements only of Thomas Burt and Rhonda Burt despite the presence on the reverse of the draft of the conspicuous notice "MUST BE ENDORSED BY ALL PAYEES." That notice accorded with the requirement, set forth under the UCC, that a negotiable instrument made payable to two or more persons not alternatively "may be negotiated . . . only by all of them." Ala. Code 1975, § 7-3-110(d). AOD's teller accepted the draft despite the absence of any endorsement by NationsBanc of the draft; $44,000 was then credited to Burt's credit-union account and $5,460.73 in cash was paid to Burt. It is undisputed that in accepting the State Farm draft without the endorsement of all the payees, AOD's teller did not exercise ordinary care as is required under Ala. Code 1975, § 7-4-202(a)(1), with respect to presenting or sending an item for presentment.
After paying Thomas Burt and crediting his credit-union account as described, AOD endorsed and forwarded the draft to a SouthTrust Bank branch in Calhoun County on January 27, 1999, and requested that its account be credited in the amount of the draft. SouthTrust then secured permission from State Farm to pay the draft from State Farm's funds on account at SouthTrust, and AOD's SouthTrust account was credited on January 28, 1999. However, the record reveals that the actual draft was not forwarded to State Farm until "several days" after State Farm had authorized SouthTrust to pay AOD, indicating that State Farm received the actual draft no earlier than February 1, 1999, *Page 34 
which was the second business day after payment was approved. The draft was then recorded on microfilm before being shredded.
During the period following AOD's acceptance of the State Farm draft, Thomas Burt gradually depleted the funds in his account at AOD. Although Thomas Burt's account balance on January 26, 1999, was $44,100 (an amount reflecting a $44,000 deposit derived from the funds represented by the draft plus $100), the account balance remaining on March 3, 1999, 30 days after the earliest date that State Farm would have received the draft from SouthTrust, was only $11,055.28. Although Thomas Burt later deposited $13,000.38 into his account at AOD, he had, by May 10, 1999, withdrawn all moneys from that account, and the account was then closed.
During July 1999, State Farm personnel ascertained, via an internal audit, that AOD had paid and credited Thomas Burt a sum equal to the amount of the State Farm draft in the absence of endorsements of all the payees named in the draft. State Farm then contacted SouthTrust and indicated that proper endorsements had not been obtained. On August 4, 1999, SouthTrust debited AOD's account by $49,460.73, the amount of the draft, and sent AOD a notice citing the improper endorsement as a basis for the debit; on August 5, 1999, the same amount of money was transferred via an official check to State Farm by SouthTrust.
Because NationsBanc notified State Farm that it had not received payment with respect to its first-mortgage interest in the lot containing the house that had suffered the fire loss, State Farm issued a new draft in November 1999 in the amount of $49,460.73, payable jointly to Thomas Burt, Rhonda Burt, and NationsBanc. At that time, NationsBanc had quoted a payoff amount of $40,008.32 as necessary to discharge the Burts' liability on the note secured by its first mortgage on the lot in question. The November 1999 draft was negotiated by all the payees and was paid by State Farm.
Although payment of the second State Farm draft satisfied NationsBanc's first mortgage on the subject lot, Clearman's mortgage remained outstanding. The Burts defaulted on the note secured by that second mortgage. In response to that default, Clearman foreclosed on her mortgage.
In November 2000, AOD sued the Burts, State Farm, Clearman, and various fictitiously named defendants in the Calhoun Circuit Court. As amended in February 2001, AOD's complaint sought, among other things, money judgments against the Burts and State Farm and a judgment declaring that AOD held an interest in the subject lot superior to that of Clearman. The Burts[2] were never served with process; however, State Farm and Clearman denied AOD's allegations in pertinent part. The case was submitted to the trial court for a decision based upon deposition transcripts, other documentary exhibits, and stipulations of the parties appearing in the action, and the trial court entered a judgment in favor of State Farm and Clearman on AOD's claims. AOD appealed.
Because the trial court entered its judgment based upon the pleadings, stipulations, documentary evidence, and exhibits, and no oral testimony was taken, the ore tenus presumption is not applicable in this case, and the trial court's findings of fact "are not entitled to the traditional presumption of correctness which is available when the trial court hears oral testimony *Page 35 
and observes the witnesses." Whitehead v. Hester,512 So.2d 1297, 1299 (Ala. 1987). Under such circumstances, an appellate court "must consider the evidence anew and render a judgment in light of the evidence and the applicable legal principles." Id.
In that portion of its brief on appeal addressing the trial court's judgment in favor of State Farm, AOD concedes, as it did in the trial court, that its conduct in accepting the jointly payable draft issued by State Farm in January 1999 was improper. Specifically, AOD concedes State Farm's point that AOD was not "entitled to enforce" that draft because AOD did not acquire title to the draft via a proper negotiation by all parties as required under Ala. Code 1975, § 7-3-110(d). Thus, it is undisputed that AOD simultaneously breached warranties to State Farm arising as a matter of law under Ala. Code 1975, § 7-3-416(a) (governing downstream transfer warranties to nonbanks) and §7-4-208(a) (governing presentment warranties to collecting banks and drawees), as well as warranties to SouthTrust arising under §7-4-207(a) (governing downstream transfer warranties to banks) and § 7-4-208(a).
However, AOD claims that State Farm was not, on the facts of this case, entitled to recover the entire face amount of the January 1999 draft ($49,460.73). In essence, AOD contends that State Farm has been unjustly enriched by South-Trust's debiting of $49,460.73 from AOD's account and SouthTrust's subsequent issuance of a check to State Farm in that amount. AOD argues that under the UCC a person claiming that a breach of a transfer or a presentment warranty has occurred is under a duty to notify the pertinent warrantor and that AOD did not receive timely notice. State Farm contends, in response, that it has fully satisfied its contractual liability to its insureds and that AOD has not stated a valid claim against State Farm.
In resolving the parties' dispute as to this issue, it is important to ascertain the legal basis of State Farm's potentially viable claims against AOD at the time that SouthTrust unilaterally transferred the funds from AOD to State Farm. In other words, had State Farm been required to litigate AOD's potential liability in the first instance, rather than acting through SouthTrust to obtain reimbursement from AOD's account of the amount of the January 1999 draft, what causes of action would have been available to State Farm?
Our review of the law in this area indicates that under the UCC,[3] and specifically the 1990 revisions to Articles 3 and 4 of the UCC as adopted in Alabama in 1995, only breach-of-warranty causes of action under § 7-3-416(a) and §7-4-208(a) would have been available to State Farm. Although we agree with State Farm that AOD's acceptance of the draft from Thomas Burt without proper endorsements of all the payees amounted to a conversion of the draft under § 7-3-420,[4]
that section *Page 36 
incorporates the intent of the drafters of the 1990 UCC revisions that conversion actions not be brought by issuers of negotiable instruments such as State Farm (see § 7-3-420(a)), an issue upon which courts applying former § 3-419 of the 1962 UCC had been divided. See generally Official Comment, Ala. Code 1975, §7-3-420. Thus, the justice of State Farm's retention of the funds debited from AOD's account in this case must be assessed based upon AOD's warranty liability.
The drafters of the 1962 UCC incorporated a significant limitation upon warranty liability with respect to banks' transfer and presentment warranties. Section 4-207(4) of that version of the UCC provided that any loss caused by a claimant's delay in making a claim of a breach of those warranties would be discharged unless the claim was "made within a reasonable time after the person claiming learn[ed] of the breach." Under that provision, a party entitled to recover based upon a bank's breach of a transfer or presentment warranty was required to bring a breach-of-warranty claim within a "reasonable time" after obtaining actual knowledge of the breach; failing such timely action, the warrantor would not be liable for any losses that were shown to have resulted from the claimant's tardiness. Thus, § 4-207(4) of the 1962 UCC was not a statute governing limitation of actions as much as one limiting liability. See Trust Co.Bank v. State, 420 So.2d 10, 13 (Ala. 1982) (observing that Ala. Code 1975, § 7-4-207, as then in effect, represented a limitation upon breach-of-warranty actions "quite different from the ordinary statute of limitations").
Our research indicates that under former § 4-207(4), insurance companies that utilized "payable through" drafts such as that issued by State Farm in this case were limited in their recoveries when they failed to observe the "reasonable time" principle in bringing claims under the UCC against depositary banks such as AOD. For example, in Great American Insurance Cos.v. American State Bank of Dickinson, 385 N.W.2d 460 (N.D. 1986), an automobile insurer issued a draft payable jointly to the owner of a truck and the holder of a lien upon that particular truck, which had been involved in an accidental collision; however, the defendant bank credited the full amount of the draft to the owner's account despite the absence of the lienholder's endorsement and transmitted the draft to the bank through which the draft was payable. The insurer approved the payment of the draft after receiving it through banking channels; however, the insurer ultimately issued a second payment in order to discharge the lienholder's interest, obtained an assignment of that interest, and sued the defendant depositary bank approximately a year later. Although the insurer initially sought relief under warranty and conversion theories, the warranty claim was dismissed, and the trial court entered a judgment in favor of the insurer in the amount (plus interest) that the insurer had paid the lienholder.
On appeal, the North Dakota Supreme Court reversed the trial court's judgment. After analyzing "the full range of potential theories of liability and parties available" under the UCC (385 N.W.2d at 464), the Great American court held that the depositary bank's liability on the insurer's conversion claim was limited by § 4-207(4) even though that statute's liability limitation applied to warranty actions; it analyzed the effect of § 4-207(4) as follows: *Page 37 
 "The objective of the U.C.C. statutory scheme for check collections, and particularly the warranty provisions, is to place the loss on the wrongdoer, or because the wrongdoer is usually unavailable or unable to pay, upon the party who last dealt with the wrongdoer because that party is in the best position to verify and obtain the necessary endorsements. Stapleton v. First Security Bank, 675 P.2d 83
(1983). The policy behind the U.C.C. warranty provisions is to speed up the collection process and to remove the burden from every bank in the collection chain to meticulously check the endorsements of each item transferred, and, thus, the first bank taking an item for collection is primarily responsible for obtaining the necessary endorsements. Federal Deposit Insurance Corp. v. Marine National Bank of Jacksonville, 303 F.Supp. 401 (M.D.Fla. 1969); Feldman Construction Co. v. Union Bank, 28 Cal.App.3d 731, 104 Cal. Rptr. 912 (1972); See generally Murray, `Joint Payee Checks — Forged and Missing Indorsements,' 78 Commercial L.J. 393 (1973). Thus, a drawee bank that pays an item over a missing endorsement is generally not obligated to discover that missing endorsement. Federal Deposit Insurance Corp. v. Marine National Bank of Jacksonville, supra; See generally Murray, `Joint Payee Checks — Forged and Missing Indorsements,' 78 Commercial L.J. 393 (1973). Consequently, in the usual check collection case involving a drawer customer and a drawee bank, a drawee bank does not `learn of the breach' within the meaning of Section 41-04-17(4) [U.C.C. § 4-207(4)], N.D.C.C., when it pays an item over a missing endorsement. Additionally, in the usual check collection case, the drawer customer has certain responsibilities with regard to checking his banking statement and items for alterations or unauthorized signatures or endorsements. Section 41-04-33 [U.C.C. § 4-406], N.D.C.C.
 "However, the instant case involves a payable through draft in which the drawer and drawee are the same entity, and that entity is not a bank. That entity initially issued the joint payee draft and was in a position to check the draft for the necessary endorsements before paying it. See Murray, `Drafts "Payable Through" Banks,' 77 Commercial L.J. 389 (1972). Professor Murray suggests that a drawer-drawee insurance company is more able to detect a forged payee's signature on a draft by comparing the signature on the draft with the insured's signature on an insurance application form or claim form. Id. at 390. We need not go so far. The instant case involves a missing endorsement which is easily discernible from the face of the instrument and requires no such comparison. In such a case, a breach of presentment warranties is evident from the face of the instrument. Both logic and equity militate in favor of imposing primary responsibility on the drawer-drawee to check the very draft which it issued in the first place to the `forger.'"
385 N.W.2d at 465-66.[5] The North Dakota Supreme Court indicated that on the facts presented the trial court should have made findings concerning "what was a reasonable time after [the insurer] learned of the breach and, if a claim were not made within that time, the extent of any loss *Page 38 
caused by the delay in making a claim." 385 N.W.2d at 466
(footnote omitted).
To like effect is Phoenix Assurance Co. v. Davis,126 N.J.Super. 379, 314 A.2d 615 (1974), in which the New Jersey Superior Court held that a depositary bank, First National State Bank ("National"), was entitled to a set-off based upon § 4-207(4) because of the delay of an insurer in bringing a breach-of-warranty claim; in that case, as here, the insurer had issued a draft to joint payees and that draft had lacked a necessary endorsement at the time it was tendered to National for deposit. In Phoenix Assurance, the insurer's draft, in a manner similar to State Farm's draft at issue in this case, specified that it was payable at a particular collecting bank without authorizing the bank to pay it. After considering § 4-207(4) and evidence tending to show that the tendering payee had maintained a small balance on account at National during the two months preceding the insurer's action, the Phoenix Assurance court held:
 "The impact of the provisions here considered (particularly N.J.S.A. 12A:4-207) is to make the initial collecting bank responsible for checking endorsements so that the collection process will be speedy and efficient, see Federal Deposit Ins. Corp. v. Marine National Bank of Jacksonville, 431 F.2d 341 (5[th] Cir. 1970) (bank of deposit liable for draft with missing endorsement in suit by assignee of payee); for the purpose of this decision, the person liable under N.J.S.A. 12A:4-207 is National. However, National has sustained loss due to plaintiff's failure to give reasonable notice. Plaintiff should not be allowed to use the existence of an intermediate bank in the collection chain, or process, to create an artificial immunity to its failure to give notice within a reasonable time. The predicate of liability on the part of National is to encourage the first bank to keep improper paper out of the collection process — an increasingly important function in light of an ever-increasing mechanization of the collection and payment process. Similarly, when claims are to be made, they should be made within a reasonable time on the facts, and the initial bank should have the benefit of N.J.S.A. 12A:4-207(4) arising from the failure to give that notice. On the facts here present plaintiff failed to act within a reasonable time and it should bear the loss to the extent that there is a basis for establishing the existence and amount of the loss."
126 N.J.Super. at 392-93, 314 A.2d at 622 (emphasis added).
Taken together, Great American and Phoenix Assurance stand for the proposition that under the UCC a party reserving the right to pay or refuse to pay a jointly payable draft must either timely notify the depositary bank of that bank's breach of warranty when all payees do not endorse the draft or must suffer a reduction in any potential recovery from that bank to the extent that the depositary bank's loss resulting from the breach could have been alleviated by timely notice. That principle of law has, if anything, only been strengthened by the 1990 amendments to the UCC; under revised Article 3 and Article 4 of the UCC as adopted in Alabama, a warrantor's liability under provisions governing transfer and presentment warranties is even more circumscribed. As we have noted, § 4-207(4) of the 1962 UCC discharged a warrantor's liability as to losses that could have been avoided had the person claiming a breach of warranty brought a breach-of-warranty claim against the warrantor within a "reasonable time" after "learn[ing] of the breach." In contrast, the 1990 version of the UCC that has been adopted by our Legislature discharges a warrantor's liability *Page 39 
as to losses that could have been avoided had the person claiming a breach of warranty notified the warrantor within 30 days
after having reason to know of the breach. See §§ 7-3-416(c),7-3-417(e), § 7-4-207(d), and 7-4-208(e), Ala. Code 1975.
In this case, AOD credited the account of Thomas Burt, one of its members, based upon the amount of the improperly negotiated draft. At that time, AOD had the right, under federal law, "to impress and enforce a lien upon the shares and dividends" of Thomas Burt "to the extent of any . . . charges payable by him."See 12 U.S.C. § 1757(11). However, State Farm did not notify AOD of the breach of transfer and presentment warranties before SouthTrust debited AOD's account in August 1999, which occurred several months after Burt had withdrawn all credited moneys from his account at AOD upon which AOD could have claimed a lien and from which AOD could have recouped a portion of its loss. Thus, State Farm's failure to notify AOD of the breach did cause AOD to suffer a greater loss than it would otherwise have suffered had timely notice been given. To that extent, AOD's liability, as a matter of law under the UCC, was discharged, and a judgment should have been entered in favor of AOD in the amount of the funds that AOD could have recouped from Thomas Burt's account.
AOD contends that it was entitled to a judgment in the amount of $16,055.28 (plus interest), the amount that remained in Thomas Burt's AOD account on January 28, 1999, when State Farm approved the payment of the draft; in the alternative, AOD contends that State Farm should pay $11,055.28 (plus interest) because that lesser amount remained in Thomas Burt's account as of March 3, 1999, 30 days after the earliest date that State Farm would have received a copy of the draft from SouthTrust. While a strong argument could be made that State Farm's conduct in approving payment of the draft on January 28, 1999, before receiving it (and being able to physically review it) amounts to negligence, we believe that State Farm could have had "reason to know" of the draft's missing endorsement, as that term is used in the pertinent UCC warranty provisions, only upon receipt of the draft itself. Compare Great American, 385 N.W.2d at 461, 466
(indicating that where approval of payment of a draft containing a missing endorsement took place after drawer's receipt of the draft, date of approval of payment would be the date when drawer "should have learned" of the missing endorsement under § 4-207(4)). Thus, we agree with AOD's alternative assertion that it could have recouped $11,055.28 had notice of the breach of the presentment and transfer warranties been given by the 30th day after State Farm received the draft — i.e., March 3, 1999. To that extent, State Farm was unjustly enriched by SouthTrust's debiting of AOD's account in the amount specified in the January 1999 draft and by SouthTrust's remitting those funds to State Farm.[6]
Although we agree that the trial court's judgment in favor of State Farm was erroneous, we cannot agree with AOD's contention that it was entitled, under principles of equitable subrogation, to assume NationsBanc's priority position as *Page 40 
to the real property that suffered the fire loss. Under Alabama law, a party's entitlement to equitable subrogation depends upon that party's satisfaction of five required elements: (1) advancement of money at the instance of a debtor in order to extinguish a prior encumbrance; (2) use of the advanced money for that purpose with the just expectation on the part of the advancing party for obtaining security of equal dignity with the prior encumbrance; (3) payment of the entire debt secured by the pertinent mortgage; (4) ignorance on the part of the advancing party of intervening liens; and (5) absence of factors "burdening" or "embarrassing" intervening lienors. SeeCollateral Inv. Co. v. Pilgrim, 421 So.2d 1274, 1276
(Ala.Civ.App. 1982). In this case, AOD plainly did not "advance" money on the Burts' behalf to NationsBanc in order to pay off the Burts' first-mortgage note. Rather, the $49,460.73 debited from AOD's account at SouthTrust was taken without AOD's consent and in purported satisfaction of a liability of AOD to State Farm based upon AOD's acceptance of the January 1999 draft; it was State Farm, not AOD, that satisfied the financial obligation giving rise to the NationsBanc mortgage. Moreover, both at the time that AOD accepted the January 1999 draft from Thomas Burt and at the time AOD suffered the debit from its SouthTrust account, AOD could have had no reasonable expectation that it would receive, in exchange, an interest in the real property that had been occupied by the Burts. We conclude that the trial court correctly determined that AOD was not entitled to subrogation to Nations-Banc's first-mortgage interest in that real property upon State Farm's satisfaction of the mortgage note.
Based upon the foregoing facts and authorities, we reverse that portion of the trial court's judgment in favor of State Farm and remand the cause for the entry of a judgment awarding AOD $11,055.28 plus interest at six percent (see § 8-8-1, Ala. Code 1975) accruing from August 4, 1999, the date on which AOD's account was debited. In all other respects, the trial court's judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
CRAWLEY, P.J., and THOMPSON and MURDOCK, JJ., concur.
BRYAN, J., concurs in the result, without writing.
[1] AOD, being a credit union, falls within the UCC's definition of "bank." See Ala. Code 1975, § 7-4-105(1).
[2] Thomas Burt has apparently disappeared.
[3] We need not, in this case, address whether common-law negligence claims may be brought by drawers such as State Farm against depositary banks such as AOD. See generally Farmers Bankof Maryland v. Chicago Title Ins. Co., 163 Md.App. 158, 168-69,877 A.2d 1145, 1151-52 (2005) (discussing split of authority). Assuming that (1) such a cause of action is not preempted by the UCC and (2) State Farm's conduct in failing to examine the draft to determine its payability would not amount to contributory negligence defeating such a claim, State Farm's appellate brief relies solely upon the UCC (and caselaw interpreting the UCC and its predecessor statutes) as a basis for AOD's liability to State Farm arising from AOD's acceptance of the January 1999 draft.
[4] UCC provisions governing conversion of a negotiable instrument have been held to displace common-law conversion causes of action based upon payment of such an instrument and the propriety of its endorsement. See American Liberty Ins. Co. v.AmSouth Bank, 825 So.2d 786, 796 (Ala. 2002).
[5] Accord, Seaman Corp. v. Binghamton Sav. Bank,220 A.D.2d 62, 65, 643 N.Y.S.2d 767, 770 (1996) (drawer/drawee in possession of its own canceled checks held to have common-law duty to examine items and to uncover any irregularities in its account).
[6] We thus do not reach AOD's alternative argument that it was prevented from taking steps that may have been available to it under Ala. Code 1975, § 7-3-418(d), to enforce the January 1999 draft. See also § 7-3-309(a), Ala. Code 1975 (enforcement of destroyed instruments). However, we note that there is no indication in the record that NationsBanc ratified the January 1999 draft so as to render that draft enforceable.